GERARD E. LYNCH, Circuit Judge:
A New York jury convicted petitioner-appellant Ellis Wood (“Wood”) of Murder in the First Degree for hiring Rasheen Harry (“Harry”) to kill Carlisle Hall (“Hall”). A videotaped statement Wood made while in police custody played a central role at trial. On appeal to the New York Supreme Court, Appellate Division, Wood argued that he had made the statement after invoking his right to eounsel and, therefore, that its admission at trial violated his Fifth and Fourteenth Amendment rights under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).[1] The Appellate Division agreed that the statement’s admission was erroneous, but found that error harmless. People v. Wood, 40 A.D.3d 663, 835 N.Y.S.2d 414, 415 (2d Dep’t 2007). The United States District Court for the Eastern District of New York (Sifton, J.) denied Wood’s habeas petition on the same grounds. Wood v. Ercole, No. 08-CV-4850, 2009 WL 1652179, at * 12 (E.D.N.Y. June 10, 2009). We must now decide whether the statement’s admission violated Wood’s right to counsel, and, if so, whether that error had a substantial and injurious effect on the jury’s verdict.
BACKGROUND
I. Investigation and Arrest
On June 2, 2001, Harry entered Ah Wee travel agency in Brooklyn, New York, walked directly up to its owner, Carlisle Hall, and killed him by firing two shots into his chest. A few weeks later, Nisha Bernard (“Bernard”), Wood’s ex-girlfriend and Hall’s former employee, told police investigators that Wood had hired Harry to commit the crime. Based on that tip, Detective Charles Arnao (“Arnao”) took both Wood and Harry into custody.
*87 Wood spent the night of August 24 inside the 71st precinct. At a line-up held the following afternoon, a witness identified Wood as the man he saw arguing with Hall ten days before the murder. Arnao then took Wood to an interrogation room, where Wood, after waiving his rights, provided an account of his activities on the day Hall was murdered. Arnao transcribed Wood’s statement and both men signed the document.
After signing, Arnao asked Wood if he would “go on video.” Wood initially agreed, but then responded: “I think I should get a lawyer.” Arnao immediately said “ok,” stopped inquiring into Hall’s murder, handed Wood a telephone, and left the room. When Arnao returned, he heard the tail-end of Wood’s conversation, which he believed “sounded more like a friend than a business” call. Arnao then arranged for video equipment to be brought into the interrogation room. Shortly thereafter, Assistant District Attorney Mark Pagliuco arrived with a video technician, read Wood his rights, and, in Arnao’s presence, recorded a brief interrogation.
On videotape, Wood disavowed any responsibility for the murder, but admitted to arriving at the scene in his green Lexus and recalled hearing two gunshots while purchasing “weed” nearby. Wood also spoke of a conversation he had with Hairy and a third individual, “Damion,”[2] moments before the shooting in which he identified Hall as “the dude that [Bernard] had a problem with,” and watched as Harry walked off towards Hall’s location. Wood further admitted to giving Harry small amounts of money and marijuana in the days following Hall’s murder.
The statement also provided a potential motive for the murder. On the videotape, Wood explained that Hall previously had “filed a complaint against [Bernard]” based on her participation in a fraudulent credit card scheme being run out of the travel agency. Harry, in his own videotaped statement, asserted that Wood, too, was involved in the fraud. Investigators believed that Wood had Hall killed in order to prevent Hall from pursuing fraud charges against him. Based on this evidence, Wood was indicted for Hall’s murder.
II. Pretrial Hearing
Prior to trial, defense counsel moved to suppress the line-up identification and both statements. He argued that the government unreasonably delayed Wood’s arraignment in order to question him “without the presence of counsel” in violation of the New York State Constitution and the Sixth Amendment. However, defense counsel failed to argue that the videotaped statement’s admission at trial would violate Wood’s Fifth and Fourteenth Amendment rights under Edwards. See Wood, 835 N.Y.S.2d at 414.
On November 13, 2002, the trial court issued an order suppressing Wood’s written statement after concluding that the nearly thirty-hour delay between Wood’s arrest and the time he was first read his rights, combined with his informal agreement with Arnao to “speak like men” if he was picked out of the line-up, made this statement “involuntary.” Nevertheless, the court admitted Wood’s videotaped statement after concluding that the video interrogation was sufficiently attenuated from Arnao’s unconstitutional conduct to “purge any taint.”[3] The trial court also *88 suppressed the eye-witness identification for the independent reason that “highly suggestive comments” by Arnao indicated the “definite presence” in the line-up of the person the witness- had seen arguing with Hall before the murder.
III. Wood’s Trial
During the brief trial, Harry and Bernard testified to Wood’s role in the murder; a few other witnesses detailed Hall’s injuries and Harry’s actions inside the travel agency. In addition, the government played Wood’s videotaped statement, which largely confirmed Harry’s version of events leading up to the shooting. The only real question before the jury was whether Wood hired Harry to kill Hall or Harry simply took it upon himself to do so. As a result, the prosecution’s case rested on Harry’s and Bernard’s credibility.
A. Testimony ofRasheen Harry
According to Harry, Wood approached him on the morning of June 2 and asked if he “want[ed] to make some money.” Wood explained that “some man had raped [Bernard],” and implied that he sought revenge. Harry, twenty-five years old and fresh out of prison, was interested.
The pair traveled together in Wood’s white Lexus, presumably to find the man in question. While stopped to change vehicles, Wood told Harry that he wanted him “to kill somebody.”' Harry agreed, and they drove together towards the travel agency in Wood’s green Lexus. Soon after arriving, Wood saw Hall walk by on his way to work and Wood identified him to Harry as “the man that raped [Bernard].” Wood then got out of the car to “go buy some weed” and gave Harry twenty dollars to purchase something to eat. Upon Wood’s return, Harry entered the travel agency and shot Hall twice in the chest. He then passed the gun off to Damion, who was waiting “by the train,” and left the scene.
Three days later, Harry called Wood asking for money. Wood told Harry to go to a local store owned by Juanchi Hildago (“Hildago”). There, Hildago lent Harry ten dollars. This represented half of the twenty dollars Harry received between the shooting and his arrest. Though Harry claimed Wood had initially offered him $500 for the murder, Harry testified that the subject was never again discussed and payment was never made. In fact, Harry testified that “it wasn’t like [Wood] really owed [him the $500].”
Defense counsel’s cross examination focused squarely on Harry’s credibility. It targeted his lengthy criminal history, his multiple conflicting accounts of the crime, and his incentive to implicate others to obtain leniency.
B. Testimony of Nisha Bernard,
The prosecution called Bernard as its final witness. Bernard explained that she and Wood often argued. Bernard’s mother sparked a particularly intense fight a few weeks after Hall’s death by calling Wood “a murderer.” In the heat of that argument, Wood told Bernard that “he could get the same person that killed [Hall] to do the same thing to [her].” Approximately two weeks later Wood shared details of Hall’s murder with Bernard and admitted to orchestrating the killing.
Bernard also testified to witnessing a phone call that Wood received from Harry, after which Wood explained that the caller was Hall’s killer and that he was asking *89 for money. Bernard then accompanied Wood to Hildago’s store, where Wood gave Harry a small amount of cash. Soon after, Bernard contacted the officers investigating the credit card scam and informed them of Wood’s role in the murder.
On cross examination, defense counsel noted Bernard’s involvement in the credit card scheme and continued contact with Wood even after his arrest, implying that Bernard testified to prevent further charges from being brought against her, even though she never believed Wood was involved in the murder. Bernard also admitted to feeling anger towards Wood. Defense counsel implied that this, and the couple’s frequent quarrels, gave her reason to implicate Wood in Hall’s murder.
C. Closing Arguments and the Jury’s Verdict
Wood’s defense was that Harry took it upon himself to kill Hall and then fingered Wood in an attempt to secure leniency. However, the admission of Wood’s videotaped statement forced defense counsel to affirm that the events it depicted were for the most part “the way it was.” This severely strained the argument that Harry acted independently of Wood and complicated efforts to undermine Harry’s credibility, because Wood’s own statement placed him at the scene, mere moments before the shooting, and acknowledged that he identified Hall to Harry at that time and place as someone Bernard “had [a] beef with.” Nevertheless, defense counsel’s summation attempted to discredit the government’s key witnesses and paint Harry as a senseless killer.
The prosecutor, in turn, began his summation by characterizing Wood’s statement as an attempt “to explain away his presence at the crime scene.” He noted that Wood knew both the victim and the shooter, but failed to contact the police after the killing. This demonstrated Wood’s guilt, he argued, because “any citizen” would have come forward with such information. The prosecutor then focused squarely on the content of Wood’s videotaped statement, arguing that it corroborated Harry’s version of events up to the moment of the shooting and, therefore, bolstered the credibility of Harry’s entire testimony. To reinforce that point, the prosecutor used details from Wood’s statement — the color and make of his car, the number of shots fired, Wood’s purchase of marijuana directly before the shooting — to confirm details from Harry’s testimony. The prosecutor thus used the statement in an effort to make the jury more likely to credit Harry’s version of the actual killing once the stories diverged.
The prosecutor also directly confronted Wood’s theory of the case by rejecting the idea of a “senseless” murder. He insisted that Harry was “not some madman____ [He was] motivated in life by money.” This led the prosecutor to further emphasize Wood’s admission that he gave Harry cash and drugs shortly after the murder. He argued: “What possible explanation is there for that? Other than that [Harry] was somehow entitled to that money.... There is no other explanation for it.”
On the third day of deliberations, the jury found Wood guilty of Murder in the First Degree, concluding that he had hired Harry to kill Hall. See N.Y. Penal Law § 125.27(1)(a)(vi).
IV. Wood’s Appeals
Wood appealed his conviction to the Appellate Division of the New York Supreme Court, claiming that the admission of his videotaped statement violated his Fifth and Fourteenth Amendment right to counsel. Wood, 835 N.Y.S.2d at 414. The Appellate Division held that the admission of Wood’s statement violated his constitu *90 tional rights, but concluded that the error was harmless. Id. at 414-15. Wood’s application for leave to appeal to the New York Court of Appeals was denied. People v. Wood, 9 N.Y.3d 928, 844 N.Y.S.2d 182, 875 N.E.2d 901 (2007).
On November 25, 2008, Wood petitioned for a writ of habeas corpus in the Eastern District of New York. See 28 U.S.C. § 2254. The district court agreed with Wood and the Appellate Division that Wood’s statement “I think I should get a lawyer” was an “unequivocal” invocation of counsel and, therefore, that his videotaped statement should have been suppressed. Wood, 2009 WL 1652179, at *8. Nevertheless, like the state appellate court, it determined that the error “did not have a substantial and injurious effect or influence in determining the jury’s verdict” and was therefore harmless. Id. at *12 (internal quotation marks omitted). This appeal followed.
DISCUSSION
A prisoner held “pursuant to the judgment of a State court” may petition the federal courts for a writ of habeas corpus “on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.” 28 U.S.C. § 2254(a).[4] This Court reviews de novo a district court’s denial of a petition for habeas corpus. Zappulla v. New York, 391 F.3d 462, 466 (2d Cir.2004); Lurie v. Wittner, 228 F.3d 113, 121 (2d Cir.2000).
I. Constitutional Violation
We must first determine whether the state appellate court correctly concluded that admitting the videotaped statement violated Wood’s right to counsel. Binding precedent is clear: once a suspect requests counsel, all interrogation must stop until an attorney is provided or the suspect reinitiates conversation. Davis v. United States, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); see also Maryland v. Shatzer, — U.S. -, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010); Edwards, 451 U.S. at 485-87, 101 S.Ct. 1880; Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This important “prophylactic rule [is] designed to prevent police from badgering a defendant into waiving his ... rights.” Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); see also Montejo v. Louisiana, — U.S.-, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009); United States v. Quiroz, 13 F.3d 505, 510 (2d Cir.1993).[5] Evidence collected *91 in violation of a suspect’s right to counsel is inadmissible as part of the prosecution’s case-in-chief. See Miranda, 384 U.S. at 494, 86 S.Ct. 1602; United States v. Morales, 788 F.2d 883, 885 (2d Cir.1986).
There is no question that Wood’s videotaped statement was taken after he stated, “I think I should get a lawyer.” To invoke the right to counsel, however, a suspect must speak clearly enough “that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.” Davis, 512 U.S. at 459, 114 S.Ct. 2350. “[AJmbiguous or equivocal” requests are insufficient. Id. Appellee argues that Wood’s statement was insufficient to “actually invoke[] his right to counsel” and therefore did not trigger Edwards’s, “rigid prophylactic rule.” Id. at 458, 114 S.Ct. 2350 (emphasis and internal quotation marks omitted). We disagree.
Wood clearly expressed his belief that, before making a videotaped statement, he should speak with an attorney. As Arnao testified, Wood “asked for a lawyer.” Wood’s language was unambiguous: he did not say “perhaps I should get a lawyer” or “maybe I need a lawyer.”[6] The statement “I think I should get a lawyer” evidences no internal debate whatsoever. Though Wood may have used a few extra words, we refuse to require criminal defendants to “speak with the discrimination of an Oxford don,” Davis, 512 U.S. at 476, 114 S.Ct. 2350 (Souter, J., concurring in judgment), in order to invoke their right to counsel.
The circumstances surrounding the interrogation erase any possible ambiguity. Cf United States v. Plugh, 576 F.3d 135, 142 (2d Cir.2009). The police held Wood for more than twenty-four hours before taking his statement. During that time, investigators confronted Wood with various interrogation techniques and, up until the moment Arnao suggested a videotaped confession, Wood complied with their every request. Nevertheless, faced for the first time with the prospect of being recorded, Wood expressed a desire for counsel. Had there been any ambiguity in Wood’s statement, Arnao could have eliminated it by asking a clarifying question designed to ferret out Wood’s true intent. See Davis, 512 U.S. at 455, 461, 114 S.Ct. 2350; Plugh, 576 F.3d at 140-41. Arnao found such inquiry unnecessary: he simply said “ok,” handed Wood a telephone, and left the room (presumably to permit a more private conversation between counsel and client). As Arnao seemingly recognized, and both the state appellate court and the federal district court found, Wood’s actions constituted an unambiguous request for counsel.
Nevertheless, Appellee claims that the words “think” and “should” somehow qualify Wood’s statement, rendering it insufficient to invoke Fifth Amendment protections. As the Eleventh Circuit has found, those words do not undermine a request for counsel. See Cannady v. Dugger, 931 F.2d 752, 755 (11th Cir.1991) (concluding that phrase “I think I should call my lawyer” was “an unequivocal request for counsel”). Absent special circumstances, a reasonable observer hearing the phrase “I think we should go to a movie” would not believe that the speaker actually wanted to stay home or go to a baseball game, or that the speaker was engaged in an internal debate rather than expressing a preference.
*92 While “I think I should get a lawyer” could theoretically be uttered with such inflection and emphasis so as to alter its plain meaning,[7] Arnao’s response forecloses that possibility here. See Abela v. Martin, 380 F.3d 915, 926 (6th Cir.2004) (“Although our inquiry is an objective one, [the interrogating officer’s] actions confirm that a reasonable officer would understand [petitioner’s] statement to be a clear request for counsel.” (internal citation omitted)). Taking Wood’s language at face value, Arnao immediately handed over a phone so that Wood could call an attorney. Nothing in the record indicates that this was anything other than a reasonable response to objectively clear language indicating that Wood thought counsel was necessary before giving a videotaped statement. See id. (“[L]anguage that might be less than clear, when viewed in isolation, can become clear and unambiguous when the immediately surrounding circumstances render them so.”).[8]
At bottom, Appellee’s argument amounts to the claim that Wood was not insistent enough. Perhaps “I demand a lawyer” would have resolved any inkling of doubt, but we cannot fault Wood for being polite and calm, rather than querulous and aggressive. His statement was unequivocal; it need not have been forcefully made. We therefore agree with the unanimous conclusion of all five judges who have expressly reviewed this issue, and conclude that Wood’s interrogators had an obligation to stop all questioning after Wood unambiguously asserted his right to counsel. Because the videotaped statement was made after this duty attached, its admission at trial violated Wood’s Fifth and Fourteenth Amendment rights.
*93 II. Harmlessness
A. Standard of Review
The conclusion that Wood’s statement should not have been admitted does not end our inquiry. The erroneous admission of a defendant’s statement in violation of his right to counsel is subject to harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Perkins v. Herbert, 596 F.3d 161, 174 (2d Cir.2010); Zappulla, 391 F.3d at 466. State appellate courts conducting harmlessness review of trial court errors must find a constitutional error “harmless beyond a reasonable doubt” before affirming a conviction. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On habeas review of state court convictions, federal courts apply a less stringent standard. We have expressed some uncertainty, however, as between two ways of formulating that standard. See Perkins, 596 F.3d at 175-76.
The Supreme Court announced the first approach in Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Brecht permits federal courts to overturn a state conviction only when the constitutional violation “had substantial and injurious effect or influence in determining the jury’s verdict.” Id. at 637, 113 S.Ct. 1710 (internal quotation marks omitted). The Brecht standard incorporates the interests of “finality ... comity and federalism” applicable to habeas review and is therefore “less onerous” than the Chapman “harmless beyond a reasonable doubt” standard applied on direct review. Id. at 635-37, 113 S.Ct. 1710.
In 1996, however, Congress amended 28 U.S.C. § 2254 to limit federal habeas relief to individuals incarcerated under state court decisions “contrary to, or involving] an unreasonable application of’ Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). This gave rise to the second approach, which requires federal courts to “assess whether the state appellate court acted reasonably in determining that the error was ‘harmless ... beyond a reasonable doubt’ ” under Chapman. Perkins, 596 F.3d at 175, quoting Mitchell v. Esparza, 540 U.S. 12, 17-19, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003).
Faced with these competing approaches, this Court recently stated that “[w]here a state appellate court has found that a state trial court committed a constitutional violation but has held that the violation was harmless, the standard of review for a federal court conducting habeas corpus review has not yet been clearly established.” Perkins, 596 F.3d at 175. And because the two approaches rarely produce different results, we have yet to settle the issue. Id. at 176. But see Gutierrez v. McGinnis, 389 F.3d 300, 306 (2d Cir.2004) (holding “that when a state court explicitly conducts harmless error review ... a habeas court must evaluate whether the state unreasonably applied Chapman ”).
However, a recent Supreme Court decision appears to have settled the debate. In Fry v. Pliler, the Court held that “in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the ‘substantial and injurious effect’ standard set forth in Brecht ... whether or not the state appellate court recognized the error and reviewed it for harmlessness.” 551 U.S. 112, 121-22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). The Supreme Court made clear that “it certainly makes no sense to require formal application of both tests ([ ]Chapman and Brecht) when the latter obviously subsumes the former.” Id. at 120, 127 S.Ct. 2321. In concert with *94 nearly all of our sister courts,[9] we conclude that the “unreasonable application of Chapman ” standard does not survive Fry. Where the Supreme Court has given clear instruction as to the standard to be applied, it is our responsibility to follow that instruction and apply that standard.
B. The Harmlessness Calculation
In assessing “whether the erroneous admission of evidence had a substantial and injurious effect on the jury’s decision, [we consider] the importance of the ... wrongly admitted [evidence], and the overall strength of the prosecution’s case.” Wray v. Johnson, 202 F.3d 515, 526 (2d Cir.2000), citing Brecht, 507 U.S. at 639, 113 S.Ct. 1710. The importance of wrongly admitted evidence is determined by “the prosecutor’s conduct with respect to the ... evidence,” Zappulla, 391 F.3d at 468, whether the evidence “bore on an issue ... plainly critical to the jury’s decision,” and “whether [it] was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative,” Wray, 202 F.3d at 526 (internal quotation marks omitted).
1. The Prosecution’s Case Was Not Strong
The strength of the prosecution’s case, absent the erroneously admitted evidence, “is probably the single most critical factor in determining whether [the] error was harmless.” Latine v. Mann, 25 F.3d 1162, 1167-68 (2d Cir.1994) (internal quotation marks omitted); see also Wray, 202 F.3d at 526. This factor favors Wood.
Putting aside the videotaped statement, only Bernard’s and Harry’s testimony directly linked Wood to the crime. As a result, the prosecution’s case rested squarely on their credibility. Unfortunately for the prosecution, both of these witnesses were heavily impeached. See Zappulla, 391 F.3d at 468-71 (determining prosecution’s case was weak in part because its witnesses lacked credibility). The prosecutor acknowledged as much during summation by admitting that Harry and Bernard “[lacked] clean hands,” and the record bears him out.
Harry is the archetypal miscreant: a frequent drinker and drug abuser who *95 spent his teenage years in and out of jails, prisons, and gangs. He testified to killing a total stranger for a promise of a few hundred dollars and admitted to lying to investigators in this very case. By trial’s end, four of Harry’s contradictory statements were before the jury. These statements alternatively claimed that (1) Wood shot Hall, (2) Wood forced Harry to shoot Hall, (3) Wood paid Harry to shoot Hall, and (4) Wood had nothing to do with Harry’s independent decision to shoot Hall.
In addition to this troubling criminal record and direct evidence of fabrication, Harry admitted to committing perjury in a previous unrelated trial.[10] Moreover, the plea agreement that secured Harry’s testimony in this case permitted him to escape life in prison, illustrating vividly for the jury his powerful incentive, once identified as Hall’s killer, to seek leniency by implicating others. Under these circumstances, a jury would be unlikely to credit Harry’s version of events absent strong corroboration. See United States v. Riggi, 541 F.3d 94, 105 (2d Cir.2008) (noting “jury’s reluctance” to rely on “cooperating witness testimony”). In a case fundamentally about whether the jury believes the shooter or his alleged patron, Harry’s credibility problems greatly undermine the strength of the prosecution’s case.
Bernard’s credibility was also compromised. She had the very same reason to testify against Wood as Wood had to kill Hall: both sought to head off any prosecution related to the fraudulent credit card scheme. Prosecution for that fraud was particularly hazardous for Bernard, who was not a legal resident and could have faced deportation. In addition, her admitted role in this crime of dishonesty made the rest of her testimony less credible.
Bernard also lacked direct knowledge of the events leading to the murder.[11] In *96 stead, her trial testimony primarily reported statements Wood allegedly made to her after the fact, often in the heat of an argument. The force of that testimony, however, was blunted by the fact that, even after Wood shared his account of Hall’s murder, Bernard admitted that she still did not believe that Wood had a role in the killing. In fact, Bernard visited Wood in prison right up to the time of trial.
The dissent insists that, taken together, the testimony of Bernard and Harry created a strong case for the prosecution because that testimony “clearly established Wood’s role in the murder-for-hire of the victim Carlisle Hall.” Dissenting Op. at 110. But this assumes that the jury would believe these two witnesses — a cooperating gunman and a disgruntled ex-girlfriend— absent the corroborating force of Wood’s videotaped statement. Our dissenting colleague persuasively explains why she would choose, if a juror, to believe these witnesses, despite the ample grounds for impeachment. But it is not for us to decide whether we think that we would have voted to convict. The question, rather, is whether the erroneous admission of Wood’s statement had a substantial and injurious effect on the jury’s decision. It was for the jury to decide the credibility of the witnesses, and absent the impact of the statement, they may very well not have seen that issue in the same light as does the dissent.
After a trial lasting less than one week, the jury — even armed with Wood’s statement — deliberated into its third day before reaching consensus. This “indicat[ed] a difference among them as to [Wood’s] guilt.” Parker v. Gladden, 385 U.S. 363, 365, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); see also Zappulla, 391 F.3d at 471 (noting “full day” deliberation “in a straightforward single-count case” meant “that a conviction was not assured”). Without the statement, and, therefore, with a substantially weaker case, a guilty verdict would be far from assured.
2. Wood’s Videotaped Statement Was an Important Piece of Evidence
As Appellee conceded at oral argument, Wood’s videotaped statement was a “significant piece of evidence.” The prosecution’s heavy reliance on the videotape during summation exposed its central role in persuading the jury to convict, and our review confirms its importance.
While not a true confession, Wood’s statement contained many highly-damaging admissions that plainly bore on issues central to the jury’s decision. In it, Wood acknowledged his presence at the scene of the crime and conceded that he identified Hall to Harry and Damion as the “sucker” Bernard was having problems with. In the words of Wood’s prosecutor, “that’s a biggie.” Wood further admitted to giving Harry “$20 when [he] had the money” as well as “a bag of weed and a couple of dollars” one evening at Hildago’s store. Certainly, Wood’s admission that, after the murder, he gave money and drugs to the shooter would be critical to the jury’s determination of whether Wood hired Harry *97 to kill Hall in the first place. It is no wonder, then, that the jury asked to view the videotaped statement during its deliberations.
Furthermore, as Appellee conceded at oral argument, Wood’s statement “locked [him] into” an implausible and highly incriminating depiction of the shooting. This created two problems for the defense: first, it forced Wood to defend a plainly absurd version of events, and second, by confirming much of Harry’s and Bernard’s testimony, Wood’s own statement crippled defense counsel’s ability to argue that Harry and Bernard should not be believed.
Wood’s videotaped statement strains credibility. In it, he purports to have simply stumbled upon Hall outside the travel agency, though he explains neither his own presence there nor the remarkable coincidence of meeting Harry at a nearby gas station. What’s more, Wood denies any “hard feelings” towards Hall, despite claiming to believe that Hall sexually harassed Bernard, his girlfriend at the time, and had her arrested for grand larceny. Nevertheless, he admits to identifying Hall to Harry as “the sucker” Bernard had a problem with. And, although Wood claims to barely know Harry, Wood insists that that statement alone prompted Harry, on his own motion, to kill.
In addition to locking Wood into a dubious version of events, the statement significantly bolstered the prosecution’s case. Because Wood never admitted to hiring Harry to kill Hall, the central question for the jury was whether to credit Harry’s testimony on that issue, despite his otherwise suspect character. Harry’s trial testimony is not intrinsically persuasive, and it was only one of the four different versions of events that he gave to the police. Yet Wood’s statement essentially confirmed every aspect of Harry’s story, save the critical detail of Wood’s solicitation of the murder. The statement was thus devastating to the defense argument that Harry was an irresponsible fabricator.
The prosecutor clearly understood that Wood’s statement was a powerful weapon in persuading the jury to credit Harry’s trial testimony. As a result, his summation led with and focused on the videotaped statement.[12] In fact, the first twenty of the summation’s fifty pages are dedicated almost exclusively to the statement, and to the role the prosecutor hoped it would play in the jury’s deliberations. See Zappulla, 391 F.3d at 471 (recognizing that the “prosecution knows intimately the strengths and weaknesses of its case,” and relying on fact that “the prosecutor found the erroneously admitted evidence to be important” in its harmlessness calculation).
The prosecutor began his summation by telling the jury that understanding the case “as a whole ... starts with ... the statement of Mr. Wood.” (emphasis added.) He then proceeded to systematically link each assertion Wood made to the testimony of Harry and Bernard. For example, after reminding the jury that Harry testified to driving with Wood to the travel agency in a green Lexus, meeting Damion, and watching Hall enter the store with another individual, the prosecutor stated:
Is [Harry] lying about any of those things? No. Mr. Wood admits each and *98 every one of those things happened. Mr. Wood admits to knowing [Harry], He admits to bringing [Harry] to that store after they met up at the gas station. Again, Mr. Harry, is he a liar? Is he making this up? No, it’s confirmed by [Wood].
Using Wood’s own words, the prosecutor buttressed the claims of his witnesses. In fact, he explicitly argued this point to the jury:
Now, [Wood’s statement] is[] not a confession. He doesn’t say “I committed murder.” He doesn’t say “I paid Rasheen Harry to kill ... Carlyle [sic ] Hall.” Far from it. It’s not a confession.
But, what it is ... is a series of very interesting admissions, if you will, statements of fact that he says that should have sounded very, very familiar to you from the testimony of Rasheen Harry and the testimony of Nisha Bernard.
Why is that important, ladies and gentlemen? Because one of the things the Judge is going to tell you about as to whether you believe a person or not is not just what their background is, but it’s whether their statements are corroborated by other facts.
Harry and Bernard are believable, the prosecutor argued, precisely because Wood said they were.
We do not suggest that the prosecutor improperly emphasized Wood’s statement to the jury. Quite the opposite: since the statement was admitted into evidence, the prosecutor had every right to rely on it in summation, and like a sldlled advocate he focused the jury’s attention on the strengths of his case. In so doing, however, he revealed his belief about the impact Wood’s statement would have on the jury. That the prosecutor found Wood’s statement so significant .confirms our belief that it was, in fact, central to the prosecution’s case. See Satterwhite v. Texas, 486 U.S. 249, 260, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (focusing, in part, on “significant weight” prosecution’s summation placed on wrongfully admitted testimony in determining harmlessness). Any experienced trial lawyer would understand that a case that is close with only the testimony of Harry and Bernard becomes much stronger when Wood’s statement is added. That is undoubtedly why the prosecutor gave the statement such a prominent place in his closing argument.
Appellee argues that Wood’s statement was “entirely cumulative” because the factual statements it contained were repetitive of Bernard’s and Harry’s testimony, and therefore contends that its admission at trial was harmless. To characterize this statement as “cumulative” would give that term an excessively broad and unrealistic meaning. The question is not whether the content of an erroneously admitted statement was otherwise before the jury, but whether the erroneously admitted evidence “filled ... a missing link” in the government’s case. Zappulla, 391 F.3d at 472. Here, the statement did not simply confirm facts that were decisively proven by other evidence. Rather, it went to the heart of the central, hotly disputed issue in the case: whether the jury should believe Harry’s account of the crime.
The prosecution’s case was based on the testimony of two questionable witnesses: Harry, the admitted shooter, testifying to secure a lighter sentence, and Bernard, Wood’s former girlfriend, who testified in the face of a potential prosecution for credit card fraud and possible deportation. The critical question for the jury was whether these witnesses were credible. The prosecution benefitted greatly by corroborating their testimony with independent evidence, from Wood’s own mouth, of Wood’s involvement in the murder. By reinforcing Harry’s and Bernard’s version of *99 events, Wood’s statement solved the credibility problem.
The prosecutor honed in on this point when he urged the jury to make credibility determinations based on whether the testimony was “corroborated by other facts.” The “other facts” to which he directed the jury were those contained in Wood’s statement, which was the only evidence the prosecutor relied on to support Harry’s and Bernard’s testimony. In a case such as this one, where guilt rests on witness credibility, key evidence affecting credibility is not merely corroborative or cumulative: by permitting the jury to credit otherwise suspect testimony, it provides a key link in the prosecution’s case.
C. The Error Was Not Harmless
When a reviewing court has “grave doubt about whether a trial error ... had ‘substantial and injurious effect or influence in determining the jury’s verdict,’ that error is not harmless. And, the petitioner must win.” O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); see also Wray, 202 F.3d at 525-26. Here, where the wrongfully admitted evidence was an inculpatory statement by the defendant central to the prosecution’s case, we can confidently say that the error was not harmless.
CONCLUSION
For the foregoing reasons, we hereby REVERSE the district court’s denial of Wood’s petition, and REMAND back to the district court with instructions to grant the writ unless the State provides a new trial within a reasonable period.[13]

. The right to counsel is most typically associated with the Sixth Amendment, which guarantees a criminal defendant "the right ... to have the Assistance of Counsel for his defence.” U.S. Const. amend. VI. However, this Sixth Amendment right only attaches during " ‘critical’ stages of the criminal proceedings,” Montejo v. Louisiana, - U.S. -, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009), and Wood’s statement was made before "proceedings” against him even began. Nevertheless, in Miranda v. Arizona, the Su preme Court interpreted the Fifth Amendment "privilege against self-incrimination” to provide additional rights to all suspects undergoing custodial interrogation. 384 U.S. 436, 458, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Among other things, these Fifth Amendment rights entitle a suspect to request the presence of an attorney during custodial interrogation, and require police officers to "scrupulously honor[]” the underlying privilege against self-incrimination protected by that request. Id. at 474, 479, 86 S.Ct. 1602. Wood alleges a violation of this Fifth Amendment "right to counsel.”

. The record refers to this individual alternatively as "Damon,” "Damien,” and “Damion.” To avoid confusion we use only Damion.

. Although the trial court did not address the *88 Fifth Amendment issue, it did refer, in passing, to Wood’s "equivocal comment about his need for an attorney.”

. Respondent-appellee Robert Ercole ("Appellee''), the Superintendent of the Green Haven Correctional Facility, raises no procedural objection to our reaching the merits of Wood's habeas petition. As the district court found, the petition was timely under 28 U.S.C. § 2244(d). Furthermore, although Wood raised his Edwards claim for the first time before the state appellate court, Wood, 835 N.Y.S.2d at 414, New York law permits "a claim that a defendant was deprived of his right to counsel during police questioning [to] be raised for the first time on appeal,” People v. Samuels, 49 N.Y.2d 218, 424 N.Y.S.2d 892, 894, 400 N.E.2d 1344 (1980). Therefore, no procedural bar prevents Wood from raising his Edwards claim in federal habeas. Similarly, by presenting this claim to the state appellate courts, Wood met the exhaustion requirement mandated by 28 U.S.C. § 2254(b)(1)(A).

. In Davis, the Supreme Court held that a defendant who validly waives his Fifth Amendment rights and thereafter seeks to reassert them bears the burden of demonstrating that his subsequent invocation was unambiguous. 512 U.S. at 460-62, 114 S.Ct. 2350; see also United States v. Plugh, 576 F.3d 135, 142 (2d Cir.2009). Appellee does not challenge the state court’s determination that Wood's initial waiver was involuntary and, therefore, the burden remains on the Appellee to show valid waiver. Plugh, 576 F.3d at 143.

. Unlike the statement in Davis, where the petitioner indicated an internal debate about whether or not to invoke his right to counsel by using the word "maybe,” 512 U.S. at 455, 114 S.Ct. 2350, Wood’s request contained no vacillation of any kind.

. If any potential for ambiguity exists, it comes from the phrase "I think." While the phrase implies a current understanding or desire, its context determines the strength of that conviction. Compare William Shakespeare, Timón of Athens act 1, sc. 2 ("I wonder men dare trust themselves with men: /Methinks they should invite them without knives; /Good for their meat, and safer for their lives.”) and William Shakespeare, The First Part of Henry the Sixth, act. 3, sc. 1 ("Methinks my lord should be religious, /and know the office that belongs to such.”) with id. act 5, sc. 3 ("And yet, methinks, I could be well contentyTo be mine own attorney in this case.”). In various contexts, "I think” could be part of an emphatic assertion of the right to counsel, as in "You want me to talk, but I think I should get a lawyer,” or it could be subsumed into an ambiguous statement, as in “I think I should get a lawyer, but I’m not sure.” It also could be little more than throat clearing, designed to show proper deference to an authority figure, as in "I think I'll just call my lawyer now.” Similarly, emphasis plays a role: "I think I should get a lawyer” more strongly asserts the right to counsel than does "I think I should get a lawyer.” Nevertheless, where, as here, the immediate circumstances indicate that the speaker intended his words’ plain meaning, it would be inappropriate for us to graft our own emphasis onto the language. Since a literal, uninflected reading of “I think I should get a lawyer” expresses a belief that counsel is needed, and Arnao, himself, testified that Wood "asked for a lawyer,” we cannot say that the state appellate court erred in interpreting it that way.

. That Arnao believed Wood called a friend, rather than an attorney, is irrelevant. First, most people do not carry a lawyer's phone number with them, and so they must reach out to a friend or family member for assistance in locating counsel. Second, Arnao does not purport to have heard, or to be able to report, the substance of Wood’s call; even if the content of the call were relevant, which it is not, Arnao’s impression that Wood was speaking to a friend would provide no useful insight into the substance of the conversation. Third, events occurring minutes after an unequivocal invocation of counsel are irrelevant: all interrogation must stop until counsel is provided or conversation is reinitiated by the suspect. Here, counsel was not provided and there is no allegation that Wood reinitiated the interrogation.

. See, e.g., Vining v. Secy, Dep’t of Corr., 610 F.3d 568, 571 (11th Cir.2010) (applying Brecht to assess state court's harmlessness determination); Welch v. Workman, 607 F.3d 674, 686 (10th Cir.2010) ("[The state court] determined the admission of the statement was harmless error. Therefore, we review only whether the admission of the testimony is harmless under the Brecht standard."); Ruelas v. Wolfenbarger, 580 F.3d 403, 412 (6th Cir.2009) ("The answer in this Circuit is that Brecht is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied Chapman ... and ... whether the constitutional error had a 'substantial and injurious’ effect on the juiy’s verdict.”); Jackson v. Norris, 573 F.3d 856, 858 (8th Cir.2009) (citing Fry and Brecht for the proposition that federal courts conducting habeas corpus review "may not grant relief unless the state trial error had a 'substantial and injurious effect or influence in determining the jury's verdict.' ”); Foxworth v. St. Amand, 570 F.3d 414, 435 (1st Cir.2009) ("The Supreme Court recently instructed federal habeas courts to perform a straightforward harmless error analysis under Brecht ... rather than review a state court's harmless-beyond-a-reasonable-doubt determination for unreasonableness.”); Bond v. Beard, 539 F.3d 256, 275-76 (3rd Cir.2008) ("Fiy instructs us to perform our own harmless error analysis under Brecht....”); Burbank v. Cain, 535 F.3d 350, 356-57 (5th Cir.2008) (Brecht "subsumes” the unreasonable under Chapman standard); Golphin v. Branker, 519 F.3d 168, 190 (4th Cir.2008) (Brecht applies whether or not the state court made its own harmlessness determination). But see Johnson v. Acevedo, 572 F.3d 398, 404 (7th Cir.2009) (applying both approaches where the state appellate court conducted its own harmless-error analysis).

. Defense counsel elicited the following testimony from Hariy regarding one of Harry's previous convictions for possession of crack cocaine:
Q: When you took the stand on your own behalf, you were in a court of law?
A: Yeah.
Q: And a courtroom pretty much like this?
A: Similar. I was on the ninth floor in this building.
Q: And before you testified to the people on the jury, you were sworn to tell the truth, weren't you?
A: Yeah.
Q: Yes?
A: Yeah.
Q: You raised your hand and said you would tell the truth, the whole truth, and nothing but the truth, right?
A: Yeah.
Q: You were sitting about as far from the people in that jury box as you are sitting from the people in this jury box?
A: Uh-huh.
Q: And you got up and you looked at them and you lied to them, didn't you.
A: Yeah.
While the dissent characterizes Harry’s admitted willingness to murder a total stranger "for no motive other than Wood's promise of some money” as ‘‘the most seriously damaging behavior to which [he] admitted at trial," Dissenting Op. at 104, there can be no doubt that Harry's credibility was also severely damaged by his admitted willingness to lie on the witness stand.

. The dissent claims that “the only explanation in this record" for Bernard’s knowledge of "details about the killing” is that Wood related them to her. Dissenting Op. at 100, 104, 105, 107, 108. We disagree. Harry testified to informing the authorities that he shared details of the killing with his girlfriend. Of course, the jury was free to believe that that conversation never occurred, and instead credit Harry’s testimony that he had merely lied to the police about communicating with his girlfriend. But the possibility that Harry told his girlfriend about the murder, combined with the fact that Bernard's mother had independent knowledge of the killing just a few hours after it occurred, indicates that information about the shooting had quickly spread throughout the neighborhood. Hall, after all, was killed on a Saturday afternoon in the middle of Brooklyn and *96 'in front of at least two witnesses besides Harry-
Certainly the vast majority of the specific details to which Bernard testified — the number of shots fired, the clothes Hall was wearing that day, and the description of the travel agency employee who had accompanied Hall into the store — would have been readily known by anyone at the scene. Absent Wood’s videotaped statement, the defense could therefore have argued that Bernard came to know details of the killing based on gossip, rather than through Wood. However, the admission of Wood’s videotaped statement at trial, which placed Wood at the scene of the crime and corroborated many of the details testified to by Harry and Bernard, foreclosed that argument.

. The fact that the statement was not merely paraphrased by a police witness but videotaped is not without significance in assessing its impact on the jury. That Wood had made the statement was beyond challenge since, as the prosecutor highlighted in summation, the jury "saw the tape.” Even more important, the visual impression of Wood directly admitting some key incriminating facts and arguably equivocating about others must have had a powerful effect on the jury.

. Although some of our cases have spoken of vacating the state conviction upon granting habeas, see, e.g., Zappulla, 391 F.3d at 464, 475; Ramirez v. Jones, 683 F.2d 712, 718 (2d Cir.1982), this Court only has the power to act on the body of the prisoner, not on the conviction itself, see Fay v. Noia, 372 U.S. 391, 430-31, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) ("Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him. Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner."), overruled on other grounds by Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Gentry v. Deuth, 456 F.3d 687, 697 (6th Cir.2006); Wilson v. Lawrence County, Mo., 154 F.3d 757, 761 (8th Cir.1998); 39A C.J.S. Habeas Corpus § 387 ("A federal writ of habeas corpus binds state courts, insofar as it mandates -a state prisoner's release from custody, but it does not vacate the judgment of conviction....”).