Filed 6/27/16  P. v. Nguyen CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H042172 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1243737) |
| v. | |
| MY LOAN NGUYEN, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

Defendant My Loan Nguyen was convicted after jury trial of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, subd. (a), 187, 189)[1] and two counts of discharging a firearm from a vehicle at another person (§ 26100, subd. (c)). Regarding the attempted murder, the jury also found true the allegation that defendant personally discharged a firearm in the commission of the offense (§ 12022.53, subd. (c)). The trial court sentenced defendant to life with the possibility of parole, consecutive to 20 years.

On appeal, defendant contends the trial court erred by admitting statements she made during two police interviews and in an apology letter, all of which were made after she invoked her right to remain silent.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

For reasons that we will explain, we will affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information with attempted premeditated murder (§§ 664, subd. (a), 187, 189; count 1) and two counts of discharging a firearm from a vehicle at another person (§ 26100, subd. (c); counts 2 & 3). The information further alleged that during the commission of the offenses in counts 1 and 2, defendant personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c) & (d)). The information also alleged that defendant had served a prior prison term (§ 667.5, subd. (b)).

The evidence at trial reflected that in October 2012, the victim was waiting outside of a store to meet defendant, whom the victim had known for about 10 years. The victim was with her boyfriend, and defendant's boyfriend was nearby. The victim and defendant had earlier exchanged angry words on the phone before deciding to meet. Defendant arrived at the victim's location as a passenger in a vehicle. As the victim and her boyfriend approached the vehicle, defendant fired a gun from the vehicle. The driver and defendant then drove off.

The police were dispatched to the scene and defendant was apprehended shortly thereafter. Defendant was interviewed in the back of the police car and later at the police station. She also wrote a letter of apology at the suggestion of the police during the second police interview.

The jury found defendant guilty of attempted murder of the victim, and also found true the allegation that the offense was committed willfully, deliberately, and with premeditation (§§ 664, subd. (a), 187, 189; count 1). The jury found not true the allegation that defendant caused great bodily injury to the victim (§12022.53, subd. (d)), but found true the allegation that defendant personally discharged a firearm (§ 12022.53, subd. (c)). The jury also found defendant guilty of two counts of discharging a firearm from a vehicle at another person with respect to the victim and her boyfriend (§ 26100,

2

subd. (c); counts 2 & 3). Regarding count 2, the jury found not true the allegation that defendant caused great bodily injury.

At a subsequent court trial in June 2014, the court found not true the allegation that defendant had served a prior prison term (§ 667.5, subd. (b)).

On January 30, 2015, the trial court sentenced defendant to life with the possibility of parole, consecutive to 20 years. The sentence consists of the term of life with the possibility of parole for the attempted murder, a consecutive term of 20 years for the firearm enhancement, and a concurrent midterm of five years for one count of discharging a firearm from a vehicle. The court stayed the sentence on the other count for discharging a firearm from a vehicle pursuant to section 654.

### III. DISCUSSION

#### A. *Parties' Contentions*

Defendant contends that the police violated her rights under the Fifth and Fourteenth Amendments by continuing to question her after she unambiguously invoked her right to remain silent. Although defendant argued below that she made three invocations of her right to counsel and/or her right to remain silent during her first police interview, on appeal she relies on only the second purported invocation. Specifically, after answering the officer's questions about the events just prior to the shooting, defendant was asked by the officer, "And then what happened?" Defendant stated, "And then, then I think I shouldn't say any more from there." Defendant contends that the remainder of that police interview, the entirety of a second police interview, and an apology letter written at a police officer's prompting should have been suppressed by the trial court. Defendant further contends that the court's error in refusing to suppress her statements was prejudicial.

The Attorney General contends that defendant's statement, "I think I shouldn't say any more from there," was not a clear invocation of the right to remain silent. The

3

Attorney General also argues that any error in failing to suppress defendant's statement was harmless.

## B. *Background*

Defendant made statements regarding the shooting on three occasions. The first occasion occurred shortly after the shooting, when defendant was interviewed in a police car after having been advised of her *Miranda* rights.[2] The second occasion occurred when defendant was interviewed at the police station after having again been advised of her *Miranda* rights. The third occasion occurred when defendant wrote a letter of apology at the suggestion of the police.

Prior to trial, defendant filed a motion seeking an Evidence Code section 402 hearing to determine the admissibility of the two police interviews and the letter of apology. The prosecution filed a motion seeking to admit all of defendant's post-*Miranda* statements. The prosecution argued that defendant was advised of her *Miranda* rights during the first police interview, that she waived her rights, and that she did not make an unequivocal and unambiguous invocation of her rights thereafter.

At the hearing on the parties' motions, the trial court listened to an audio recording of defendant's first police interview and was provided a transcript by the prosecution. The parties stipulated that the court could rely on or use the transcript as an aid to the audio recording.

At the beginning of the first police interview, Officer Santiago asked defendant for her name and then immediately advised her of her *Miranda* rights – the right to remain silent, the consequences of forgoing that right, the right to the presence of an attorney, and the right to appointment of an attorney if defendant was indigent. Defendant indicated that she understood her rights and proceeded to answer the officer's questions.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Officer Santiago asked defendant generally what had occurred and then followed up with more specific questions. Defendant stated that she had gotten into an argument with her boyfriend on the phone. At the time, her boyfriend was at the residence of the victim, who was the mother of his children. While defendant was on the phone with her boyfriend, the victim started "talking shit" to defendant by phone and by text. The victim told defendant to "meet up" with her. Defendant and a friend, who drove defendant's car, went to meet the victim.

Officer Santiago eventually asked, "[W]here did you guys meet up at?" Defendant responded, "*Mm, we met up at um, should, should I have an attorney present? I don't know if uh, I should have an attorney present.*" (Italics added.) The officer responded that he was trying to get defendant's side of the story. Defendant stated that they met at a store.

Defendant thereafter continued to answer the officer's questions about what happened. Defendant indicated that the victim, the victim's boyfriend, and defendant's boyfriend approached the front of defendant's car on foot. The following exchange then occurred between Officer Santiago and defendant:

"[Defendant:] And I thought they were gonna come up, uh, you know?

"[Officer:] And then what happened?

"[Defendant:] *And then, then I think I shouldn't say any more from there.*

"[Officer:] Well, like I said, I, I'm just tryin' to get your side of the story, I mean, it sounds like, like your—

"[Defendant:] And—

"[Officer:] Your baby daddy, you know, caused some drama.

"[Defendant:] He did.

"[Officer:] And—

"[Defendant:] He's always like that.

"[Officer:] Yeah, see, well, well, you know, uh—

5

"[Defendant:]  And then they came at me, so, man, I'm pregnant, I, I ain't gonna fight with her.

"[Officer:]  Well, see—

"[Defendant:]  And I don't . . .

"[Officer:]  The thing is that, that I don't know you, I don't know him, I don't know her.

"[Defendant:]  So you're just . . .

"[Officer:]  So, so that's why—

"[Defendant:]  Getting the background.

"[Officer:]  Hold on, so—

"[Defendant:]  He has a warrant too.

"[Officer:]  Does he?

"[Defendant:]  Yeah, he does.

"[Officer:]  So that, that's why I'm trying to get your side of the story, because I, I wanna understand what happened from your perspective, and if you're tellin' me that, that your baby daddy started some drama, then . . .

"[Defendant:]  He did.

"[Officer:]  I mean, I, I, I, if I go ask him that, he's probably gonna give me a different story, right?

"[Defendant:]  Yeah, you can ask him that.

"[Officer:]  So, so that, that's why . . .

"[Defendant:]  (Inaudible.)

"[Officer:]  I wanna get your side of the story, so I understand from your perspective . . .

"[Defendant:]  Yeah, I got so many . . .

"[Officer:]  What occurred.

"[Defendant:]  People to vouch for me, that he's just (inaudible), and he's—

6

"[Officer:]  Okay.

"[Defendant:]  But anyway, yeah, and—

"[Officer:]  Well, that, that's what I'm saying—

"[Defendant:]  And they came up, they were in front of my car, and then I come, like, to here, and they're comin' at me, so, so I do what I had to do, and they left, I don't know.

"[Officer:]  So you had to do what you had to do, what do you mean by that?

"[Defendant:]  *I don't know, you know what, I think that, I, I don't think I should say anything, I . . . need an attorney, I don't know.*[3]  I don't know, just like, and they, he started shit, he, they called me out, yeah, I was, three of 'em standing, but I'm pregnant, you know, so, that's, I—I ain't gonna have her beat on me, I'm pregnant.  And you know, she had two guys with her.  So, yeah.  So."  (Italics added.)

Defendant then indicated that after the incident occurred, she and her friend drove away.  The officer asked what happened to the gun, but defendant did not provide a direct answer.

After the recording of defendant's first police interview was played for the trial court, the court heard argument from the parties.  Defendant contended that she had clearly invoked her right to counsel and/or her right to remain silent on the following three occasions during the interview:  (1) "Mm, we met up at um, should, should I have an attorney present?  I don't know if uh, I should have an attorney present"; (2) "And then, then I think I shouldn't say any more from there"; and (3) "I don't know, you know

---

**3** We have quoted from the transcript of the audio recording of defendant's statement to the police.  The trial court, in making its ruling, appeared to rely on the transcript.  However, in referring to this particular statement by defendant, the court quoted her as saying, " 'I think I shouldn't say,' period.  'I need an attorney,' period.  'I don't know.'  End of quote."  The minor differences between the transcript of the audio recording and what the court apparently determined was stated by defendant at this point is not material to our analysis.

what, I think that, I, I don't think I should say anything, I . . . need an attorney, I don't know." Defendant contended that the officer continued to interview her in violation of her Fifth Amendment rights, and that her second interview at the police station and the apology letter should be suppressed. The prosecution contended that defendant did not clearly invoke her right to counsel or her right to remain silent.

The trial court took the matter under submission. The following day, the court denied defendant's motion to exclude defendant's post-*Miranda* statements. The court found that defendant's three cited statements during the first police interview, individually or in totality, were not an unequivocal and unambiguous invocation of her rights.

At trial, audio recordings of defendant's two police interviews and a redacted version of defendant's apology letter were admitted into evidence.

## C. *General Legal Principles*

" 'In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect "must *unambiguously*" assert his [or her] right to silence or counsel. [Citation.] It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his [or her] rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda, supra,* 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether.' [Citations.]" (*People v. Suff* (2014) 58 Cal.4th 1013, 1068.)

Thus, to invoke the right to counsel, the defendant " 'must articulate his [or her] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' [Citations.]" (*People v. Nelson* (2012) 53 Cal.4th 367, 376 (*Nelson*).) "[W]hile 'requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other

8

reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present,' it is the *Miranda* warnings themselves, which—when given to the suspect and waived prior to questioning—are ' "sufficient to dispel whatever coercion is inherent in the interrogation process." ' [Citation.]" (*Id.* at p. 377.)

"The requirement of an unambiguous and unequivocal assertion likewise applies to a suspect's invocation of the right to silence. [Citations.]" (*Nelson*, *supra*, 53 Cal.4th at p. 377.) The California Supreme Court has held that " '[a] defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning.' [Citations.]" (*People v. Williams* (2010) 49 Cal.4th 405, 433-434 (*Williams*).)

The California Supreme Court has construed statements similar to the one made by defendant here ("I think I shouldn't say any more from there.") to be equivocal and ambiguous. For example, the California Supreme Court determined that the statement, " 'I think it'd probably be a good idea for me to get an attorney,' " was not "sufficiently clear in and of itself" because it "contains several ambiguous qualifying words ('I think,' 'probably,' and 'it'd')." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105 (*Bacon*); see *People v. Shamblin* (2015) 236 Cal.App.4th 1, 20 (*Shamblin*) [the "defendant's statement—'I think I probably should change my mind about the lawyer now. . . . I think I need some advice here'—contains language that is conditional ('should') and equivocal ('I think' and 'probably')"].) The California Supreme Court similarly concluded that the statement, " 'I think it's about time for me to stop talking,' " was ambiguous and "expressed apparent frustration, but did not end the interview." (*People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*).)

Likewise, some federal courts have determined that a defendant's statement prefaced with "I think" is an ambiguous or equivocal assertion of rights. (See *United States v. Delaney* (E.D.Mich. 2008) 562 F.Supp.2d 896, 904 [" 'I don't think that I

9

should be saying anything without my lawyer" was ambiguous]; *United States v. Mohr* (8th Cir. 2014) 772 F.3d 1143, 1146 [" 'I think I should get [a lawyer]' " was equivocal]; *Burket v. Angelone* (4th Cir. 2000) 208 F.3d 172, 198 [state court's determination that " 'I think I need a lawyer' " was equivocal was not an unreasonable application of federal law]; *Henness v. Bagley* (6th Cir. 2011) 644 F.3d 308, 319-320 [state court's determination that " 'I think I need a lawyer' " was ambiguous was not an unreasonable application of federal law]; *Clark v. Murphy* (9th Cir. 2003) 331 F.3d 1062, 1069, 1071 [state court's determination that " 'I think I would like to talk to a lawyer' " was ambiguous was not an unreasonable application of federal law]; *Williams v. Horel* (9th Cir. 2009) 341 Fed.Appx. 333, 335 [state court's determination that " 'I think first, um, I should have a lawyer' " was ambiguous was not an unreasonable application of federal law].)

On the other hand, some federal courts have determined that an invocation of rights prefaced with "I think" is not ambiguous or equivocal. (See *Wood v. Ercole* (2d Cir. 2011) 644 F.3d 83, 91-92 [state appellate court correctly concluded that " 'I think I should get a lawyer' " was an unambiguous assertion of right to counsel]; *Cannady v. Dugger* (11th Cir. 1991) 931 F.2d 752, 755 [determining that the defendant's petition for writ of habeas corpus should be granted because his statement, " 'I think I should call my lawyer,' was an unequivocal request for counsel" and therefore his confession was illegally obtained].)

The determination of whether a defendant has invoked his or her right to silence often depends on the context of the statements. "In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends." (*Williams*, *supra*, 49 Cal.4th at p. 429.)

"[T]he standard of review—like the standard applicable in the trial court—focuses on 'whether, in light of the circumstances, a reasonable officer would have understood a

10

defendant's reference to an attorney [or to remaining silent] . . . to be an unequivocal and unambiguous request for counsel [or to remain silent], without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel [or to remain silent], and with no further requirement imposed upon the officers to ask clarifying questions of the defendant.' [Citations.]" (*Nelson*, *supra*, 53 Cal.4th at p. 380.) "In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]" (*Bacon, supra,* 50 Cal.4th at p. 1105.)

### D. *Analysis*

We determine that a reasonable officer would not have understood defendant's statement, "I think I shouldn't say any more from there," was an unequivocal and unambiguous invocation of the right to remain silent. (*Nelson*, *supra*, 53 Cal.4th at p. 380.)

First, defendant's statement contained ambiguous or equivocal language. Her statement was prefaced with "I think," which the California Supreme Court has characterized as "ambiguous qualifying words." (*Bacon*, *supra*, 50 Cal.4th at p. 1105; accord, *Shamblin, supra,* 236 Cal.App.4th at p. 20 [" 'I think' " is equivocal language].) Moreover, statements similar to defendant's statement have been found to be equivocal or ambiguous by California courts. (*Bacon*, *supra*, at p. 1105 [" 'I think it'd probably be a good idea for me to get an attorney' "]; *Stitely*, *supra*, 35 Cal.4th at p. 535 [" 'I think it's about time for me to stop talking' "]; *Shamblin*, *supra*, at p. 20 [" 'I think I probably should change my mind about the lawyer now. . . . I think I need some advice here' "].)

Second, in considering the context in which defendant made the statement, the record reflects that defendant continued to talk freely to the officer after making the statement. (See *Shamblin*, *supra*, 236 Cal.App.4th at p. 20 ["that defendant did not

11

intend to terminate the interview is clear from the exchange that immediately followed"].)  Immediately after defendant stated, "I think I shouldn't say any more from there," the police officer started talking but barely finished one sentence before defendant interrupted him.  As the officer continued to try to speak, defendant repeatedly interrupted him, including at times to express agreement with what the officer was saying.  The officer was unable to complete more than one sentence before defendant again interjected.  The officer even said to defendant, "Hold on, so—," but he was interrupted by defendant.  The conversation continued, and defendant eventually interrupted the officer to say that the victim, the victim's boyfriend, and defendant's boyfriend were "comin' at me, . . . so I do what I had to do," apparently in reference to shooting the victim from the vehicle.  Defendant made this statement even though the officer had not posed a question to her immediately prior to this statement.

Thus, rather than ceasing to talk after making the statement, "I think I shouldn't say any more from there," defendant displayed an ongoing willingness to talk to the officer.  In view of the words defendant used ("I think I shouldn't say any more from there") and her eagerness to talk right after making the statement, it was reasonable for the officer to interpret the statement as an equivocal reference to remaining silent.  (*Nelson*, *supra*, 53 Cal.4th at p. 380.)

Third, the statement at issue was made between two other ambiguous and equivocal references to counsel and/or to remaining silent.  Defendant concedes that her first mention of an attorney ("[S]hould I have an attorney present?  I don't know if . . . I should have an attorney present.") "did not unambiguously express a desire to have counsel present."  Likewise, defendant's last reference to an attorney and to not talking ("I don't know, you know what, I think that, I, I don't think I should say anything, I . . . need an attorney, I don't know.") was equally ambiguous and unequivocal, given her repeated "I don't know" statements and the fact that she continued to talk about the incident thereafter without any comment from the officer.

12

Given the qualifying words that defendant used in all of her references to an attorney and to remaining silent, and given that she continued to talk freely right after making each of the three statements concerning an attorney and/or remaining silent, we determine that defendant's statement, "I think I shouldn't say any more from there," was not sufficiently clear that a reasonable police officer would understand the statement to be an invocation of the right to remain silent (*Nelson*, *supra*, 53 Cal.4th at pp. 376, 380). Because we determine that defendant's *Miranda* rights were not violated, we need not address whether she was prejudiced by the admission of the statements that she made after the asserted invocation of the right to silence.

Accordingly, we conclude that the trial court did not err by declining to exclude from evidence defendant's two police interviews and her letter of apology.

## IV. DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MIHARA, J.