United States v. Stewart

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: February 26, 2018          Decided: November 5, 2018)

Docket No. 17-593
_____

UNITED STATES OF AMERICA,

*Appellee,*

-- v. --

SEAN STEWART,

*Defendant-Appellant,*

RICHARD CUNNIFFE, ROBERT STEWART, aka Bob,

*Defendants.*
_____

B e f o r e:

KATZMANN, *Chief Judge*, LEVAL, *Circuit Judge*, and BERMAN, *District Judge*. [*]

_____

[*] Judge Richard M. Berman, United States District Court for the Southern District of New York, sitting by designation.

_____

Defendant-appellant Sean Stewart appeals from a judgment of conviction entered on February 24, 2017, in the United States District Court for the Southern District of New York (Swain, *J.*). In connection with an insider trading scheme, the defendant-appellant was found guilty after a jury trial of conspiracy to commit securities fraud and tender offer fraud, in violation of 18 U.S.C. § 371; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; six counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78f; and tender offer fraud, in violation of 15 U.S.C. §§ 78n(e) and 78ff. On appeal, the defendant-appellant argues that he was deprived of an opportunity to examine a key witness in light of that witness's improper invocation of the Fifth Amendment privilege against self-incrimination; that his due process rights were violated by the district court's decision not to immunize that witness in order to allow the witness to testify without fear of self-incrimination; and that several evidentiary errors were made. Although we disagree with the defendant's constitutional arguments, we nevertheless find that certain impeachment material that might have influenced the jury's deliberations should not have been excluded. Accordingly, the judgment of the district court is **VACATED** and **REMANDED**.

Judge Berman dissents in a separate opinion.

_____

BROOKE E. CUCINELLA (Sarah K. Eddy, Brian Blais, and Margaret Garnett, *on the brief*), Assistant United States Attorneys, *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

ALEXANDRA A.E. SHAPIRO, (Sean Nuttall, *on the brief*), Shapiro Arato LLP, New York, NY, *for Sean Stewart*.

_____

PER CURIAM:

This is an unusual insider trading case, in that defendant-appellant Sean Stewart does not contest that he provided material, nonpublic information to his father, Robert Stewart. Rather, Sean readily acknowledges that "he was very close to his father, routinely confided in him, and even occasionally mentioned potential deals," and that his father and others then invested based upon that information. Def. Br. 1. The key question facing the jury was whether to believe Sean when he denied that he knew that his father would trade on the information that Sean had provided. Evidently they did not, as Sean was convicted on all counts brought against him.

The government's case largely hinged on the so-called "silver platter statement," in which Sean purportedly told Robert that he expected Robert to invest based upon information to which Sean had access through his work as an investment banker. In this matter, a silver platter proved to be the government's silver bullet. Because we agree that Sean should not have been precluded from

impeaching the silver platter statement, however, we **VACATE** the conviction and **REMAND** this matter to the district court for further proceedings.[1]

## BACKGROUND

Sean Stewart testified that he was "very close" to his parents growing up and that he had an "excellent" relationship with his father, Robert Stewart, in particular. Tr. 1129-30. Into adulthood, Sean would regularly speak with his parents several times per week by phone and would see them in person once or twice per month. Among the topics that they often discussed were Sean's career and what he was working on. Although Sean knew that company policy forbade him from discussing confidential information with anyone other than his colleagues, he did not abide by that rule. Rather, he admitted that he "spoke very freely" with his family, explaining that he "grew up in a household where there were no secrets, and [his family] shared everything about [their] lives." *Id.* at 1189.

---

[1] In light of this disposition, the defendant's procedural reasonableness challenge to his sentence is now moot.

4

Sean began working as an analyst at JP Morgan Chase in 2003. Among the matters that Sean worked on while at JP Morgan was the sale of a pharmaceutical research company, Kendle International, Inc. Robert began purchasing Kendle common stock on February 7, 2011, shortly after Sean had attended a kick-off meeting for the Kendle project. In addition, Robert asked a colleague, Mark Boccia, to make further investments in Kendle on Robert's behalf. Boccia began doing so in mid-February, with some of the investments made on his own behalf and some on behalf of Robert. Kendle's acquisition was publicly announced on May 4, 2011. The following day, Robert sold his Kendle securities, and, acting on Robert's advice, Boccia did the same. Boccia then paid Robert a share of his trading profits in cash.

At around the same time, JP Morgan was also involved in the sale of Kinetic Concepts, Inc., a medical device company known as "KCI." Although Sean did not work on the KCI transaction directly, he was involved with ensuring that it was properly staffed. Boccia began purchasing KCI call options on behalf of both himself and Robert on April 5, 2011, with Robert this time telling Boccia that Sean "knew that [KCI was] going to merge." *Id.* at 371. Robert

5

also asked another colleague, Richard Cunniffe, to purchase KCI call options on his behalf, explaining that he could not do so directly because "he was too close to the source." *Id.* at 623. Cunniffe began purchasing KCI call options on April 21, 2011. In addition, Robert began personally purchasing KCI common stock on May 5, 2011, the same day on which he had sold his Kendle shares. The KCI transaction was publicly announced on July 13, 2011, generating significant profits for Cunniffe and Robert, though Boccia's options had already expired by that time.

Meanwhile, on May 25, 2011, Sean was made aware that the Financial Industry Regulatory Authority ("FINRA") was investigating suspicious trading in Kendle securities. In connection with that investigation, Sean was asked whether he knew any of the individuals whose names appeared on a list circulated by FINRA. Although Robert appeared on the list, Sean initially denied recognizing any of the listed names. JP Morgan requested that Sean review the list again after FINRA inquired further, at which time Sean acknowledged that the list included his father's name. JP Morgan's legal and compliance staff subsequently arranged to meet with Sean on August 26, 2011.

6

The night before that meeting, Sean and Robert met at the Yale Club. According to Sean, he told Robert about the upcoming meeting and said that Robert's name had appeared on FINRA's list. Sean testified that he confronted his father about the Kendle trades because he was "confused, ashamed, [and] taken aback," and he "wanted to know why [Robert] would do something so foolish, so stupid," as Sean knew Robert might have learned of the Kendle transaction from their conversations. *Id.* at 1235. Sean described Robert as "embarrassed" and "nervous" upon being asked about Kendle, claiming to have invested based upon public information, though Sean did not believe him. *Id.*

The following day, Sean told JP Morgan compliance and legal personnel that he had not discussed Kendle with his father. Sean has admitted that he "lied," explaining that he "was nervous about [Robert] getting in trouble" and recognized that his father's investments "would be potentially damaging for [his] prospects" professionally. *Id.* at 1236. Sean claimed that a few days after his meeting at JP Morgan, he told Robert "to never do that again, and [Robert] promised that he would not." *Id.* at 1237. Sean believed Robert, who Sean described as having been "pretty shaken up" by the experience. *Id.* at 1251.

7

Although neither FINRA nor JP Morgan took any disciplinary measures against Sean, FINRA nevertheless referred the matter to the Securities and Exchange Commission, which conducted its own investigation. The SEC spoke with Robert, who acknowledged that Sean worked at JP Morgan but denied having discussed Kendle with Sean either before or after he had purchased the company's stock. The SEC subsequently closed its investigation without taking any enforcement action.

Sean left JP Morgan for Perella Weinberg Partners, a boutique investment bank, in September 2011. While at Perella Weinberg, Sean worked on the acquisitions of Gen-Probe, Inc., and CareFusion, both medical device companies, and learned of the planned acquisition of Lincare Holdings, Inc., a home healthcare company. Cunniffe purchased the securities of each of these companies in advance of the acquisitions, doing so at the suggestion of Robert in each instance, and sold the securities after each acquisition was publicly announced. Each time, Cunniffe shared the investment proceeds with Robert.

The profits from these five investments totaled $1.15 million. In approximate terms, Cunniffe received $1 million; Robert received $150,000; and

Boccia lost money as a result of the expiration of his KCI call options. There is no evidence that Sean directly profited from the investments.

Unbeknownst to Robert, the Federal Bureau of Investigation approached Cunniffe sometime in the spring of 2015, after all of the investments at issue. Cunniffe decided to cooperate with the FBI, and subsequently recorded several conversations with Robert. Most relevant to this litigation is a conversation between Robert and Cunniffe that occurred on March 24, 2015, during which they had the following exchange regarding Robert's Kendle investments:

> **Robert**: And then like about a year later I get a call from the SEC questioning me on that transaction. [Indiscernible] 5,000 dollar transaction. What are they gonna do? And then nothing happened. I don't know what they're doing now. I figure it's a 3 year statute, 4 year, 5 year whatever it it's way way over that. But it pretty much put a fear in me that a [indiscernible].

> **Cunniffe**: Would scare the shit out of me [indiscernible] that's for sure.

> **Robert**: Yeah. *I mean I still, I still remember being [indiscernible] years ago. Sean would always say, ah I can't believe you [indiscernible]. Said I can't believe it. I handed you this on a silver platter and you didn't invest in this*, and you know. I said, Sean, did you ever get a call from the SEC, like I'm gonna actually do this [indiscernible], and he says [indiscernible]. I mean [Laughter]. Yeah, that is something.

Supp. App. 143-44 (alterations in original, emphasis added). The district court referred to the italicized portion of this conversation as the "silver platter statement," nomenclature which we hereby adopt.[2]

Robert was arrested and interviewed by the FBI shortly thereafter. During the attendant questioning, Robert claimed that Sean only learned of the Kendle trades "after the fact," at which point Sean became "[s]urprised and ang[ry]," prompting Robert to acknowledge that "it was stupid" for him to have invested. S.D.N.Y. Dkt. No. 120-2 at 11, 16. When asked why Sean told Robert about other deals that he was working on following the Kendle episode, Robert speculated that Sean "figured I probably wouldn't do it again—you know—in his eyes, y'know—I'm his father—I'm—y'know—on a pedestal." *Id.* at 16. Robert repeatedly denied that Sean was aware of any of the other investments or that Sean had intended that Robert would trade on any of the information that Sean had provided.

---

[2] At trial, Sean expressly denied having said "anything like that" to Robert. Tr. 1328.

10

The FBI asked Robert twice about the silver platter statement. The

following colloquy occurred near the start of the interview:

> **FBI**: [H]ow do you explain a comment you made to Rick [Cunniffe], that Sean got angry with you when he gave you this information on a silver platter and you didn't invest.
>
> **Robert**: I think I was just saying to Rick because Sean said, "Uh y'know, all these deals—if you were trading—you could have made like millions of dollars[,]" and I said, "Sean nobody's going to trade and make millions of dollars on this stuff." That wasn't his intention.
>
> **FBI**: So why was Sean giving you this information?
>
> **Robert**: I think he was just proud of the fact that he was doing deals and y'know, almost like ["]hey, this deal is going to go way up[,"] not intending that somebody was going to trade on it.

*Id.* at 1-2. Subsequently, the interview returned to the same topic:

> **FBI**: So why did he get mad at you? Why did he get mad at you and say, "I served this up to you on a silver platter and you didn't invest in it." Why did he get mad at you about that?
>
> **Robert**: Um, I think that—that day, he was clearly drinking.
>
> **FBI**: You remember that day specifically?
>
> **Robert**: I remember—y'know—during that period, because he was getting divorced, he's—y'know—and um, he just said[,] I think he might've said, "Y'know, Uh, y'know, I said I was working on this deal—gee, if you had invested, you would've made millions of dolars." And I said, "Sean, y'know, people[,] y'know[.]"

**FBI**: Get arrested for that?

**Robert**: "Get arrested for making millions and millions of dollars on confidential information."

**FBI**: Mmhm.

**Robert**: And that was the end of the conversation.

*Id.* at 11.

The operative indictment was filed in the Southern District of New York on July 15, 2015, charging both Sean and Robert with conspiracy to commit securities fraud and tender offer fraud, conspiracy to commit wire fraud, tender offer fraud, and six counts of securities fraud. Robert pleaded guilty to a single conspiracy count on August 12, 2015, while Sean proceeded to trial. The parties engaged in extensive motion practice before that trial commenced. The following recitation reflects only those motions and rulings as are relevant to this appeal.

First, Sean moved to preclude introduction of the silver platter statement as hearsay. The district court denied that motion, reasoning that Robert's relaying of the statement to Cunniffe was against Robert's penal interest.

Having failed to exclude the silver platter statement, Sean subsequently moved for leave to introduce Robert's post-arrest statements to the FBI in order

12

to impeach the credibility of the silver platter statement. That, too, was denied, on the ground that Robert did not specifically state that the silver platter statement had not been made.

Next, Sean sought to compel Robert's testimony via subpoena. Robert responded by invoking his Fifth Amendment right against self-incrimination in response to each topic on which either Sean or the government hoped to inquire, after which the district court conducted an *in camera* proceeding with only Robert and his counsel present to assess the viability of Robert's claimed privilege. The district court thereafter sustained Robert's invocation of the Fifth Amendment.

As a last resort, Sean sought to have Robert immunized in order to allow him to testify without the risk of self-incrimination. The district court denied that request as well, finding an absence of extraordinary circumstances that would merit providing Robert with immunity for his testimony.

Sean's trial began on July 27 and concluded on August 9, 2016. The cornerstone of his defense was his professed belief that he could trust his father, who Sean not did intend or expect would misappropriate his confidences for pecuniary gain. To rebut that argument, the government relied heavily on the

13

silver platter statement. The jury convicted Sean on all counts on August 17,

2016. This appeal followed.

**DISCUSSION**

## I.    Privilege Against Self-Incrimination

In relevant part, the Fifth Amendment provides that "[n]o person . . . shall

be compelled in any criminal case to be a witness against himself." U.S. Const.

amend. V. "The privilege afforded not only extends to answers that would in

themselves support a conviction under a . . . criminal statute but likewise

embraces those which would furnish a link in the chain of evidence needed to

prosecute the claimant for a . . . crime." *Hoffman v. United States*, 341 U.S. 479, 486

(1951). "To sustain the privilege, it need only be evident from the implications of

the question, in the setting in which it is asked, that a responsive answer to the

question or an explanation of why it cannot be answered might be dangerous

because injurious disclosure could result," the assessment of which requires that

the trial judge "'be governed as much by his [or her] personal perception of the

peculiarities of the case as by the facts actually in evidence.'" *Id.* at 486-87

(quoting *Ex Parte Irvine*, 74 F. 954, 960 (C.C.S.D. Ohio 1896) (Taft, *J.*)).

14

The danger that Robert's potential testimony posed to him is evident from the subject-matter on which the parties sought to question him. Those topics were submitted in advance to the district court and clearly related to both his trading activities and the veracity of his prior statements to the FBI and SEC. Robert expressly invoked his Fifth Amendment privilege against self-incrimination with respect to each such topic, after which the district court discussed these issues further with Robert's counsel *in camera*. Moreover, the government made clear that it believed Robert had engaged in additional insider trading for which he had not been charged and that he had also violated 18 U.S.C. § 1001(a) by making false statements to federal law enforcement officials.

Although trial judges must engage in a "particularized inquiry as to whether each of [a witness's] claims of privilege could provide evidence that would tend to incriminate him" if the danger of self-incrimination "is not readily apparent from the implications of the questions asked or the circumstances surrounding the inquiry," this is not such a case. *Estate of Fisher v. Comm'r of Internal Revenue*, 905 F.2d 645, 649, 651 (2d Cir. 1990). Where the hazards of self-incrimination are readily apparent, a witness's invocation of the privilege against

15

self-incrimination need not be tested by the rote recitation of questions that have obvious answers of which the judge is already aware.

## II.     Procedural Due Process

"The government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized." *United States v. Ebbers*, 458 F.3d 110, 118 (2d Cir. 2006). Nevertheless, "under 'extraordinary circumstances,' due process may require that the government confer use immunity on a witness for the defendant." *United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir. 1979). A defendant requesting such relief must make a two-pronged showing:

> First, the defendant must show that the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation. . . . Second, the defendant must show that the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source.

*Ebbers*, 458 F.3d at 119 (internal quotation marks and citations omitted). "We review the court's factual findings about government actions and motive for

16

clear error, but its ultimate balancing for abuse of discretion," although the situations in which conferring immunity would be required are "[s]o few and exceptional" that "we have yet to reverse a failure to immunize." *United States v. Ferguson*, 676 F.3d 260, 291 (2d Cir. 2011). This case is no exception.

Sean first argues that the district court engaged in discriminatory tactics by conferring immunity on Boccia while declining to immunize Robert. The district court did not abuse its discretion in rejecting that argument. "Our Circuit's approach to defense witness immunity . . . recognizes the essential unfairness of permitting the Government to manipulate its immunity power to elicit testimony from prosecution witnesses who invoke their right not to testify, while declining to use that power to elicit from recalcitrant defense witnesses testimony" that might exculpate a defendant. *United States v. Dolah*, 245 F.3d 98, 106 (2d Cir. 2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). Yet such decisions are not discriminatory if they are "consistent with legitimate law enforcement concerns." *Ebbers*, 458 F.3d at 119.

Robert and Boccia were not similarly situated from a law enforcement perspective. For instance, Boccia and Sean never met, whereas Robert spoke with

17

Sean regularly and served as a conduit for the material nonpublic information provided by Sean. In addition, Boccia traded in securities for only two of the five companies at issue in this action, and actually lost money doing so, whereas Robert profited by trading, directly and indirectly, in the securities of all five companies. Relatedly, Boccia last traded on information provided by Sean in June 2011, whereas Robert did so in 2014, just a few short months before his arrest. These distinctions provide ample justification for their disparate treatment.

Nor was it an abuse of discretion for the district court to find that the government did not overreach. "Prosecutorial 'overreaching' can be shown through the use of 'threats, harassment, or other forms of intimidation.'" *Id.* (quoting *Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir. 1991)). That is simply not borne out by the record here. The prosecutors in question submitted declarations asserting that they did not state, suggest, or imply that Robert would face adverse consequences based on whether or not he chose to testify at Sean's trial. In response, all that Sean musters are vague statements made by Robert's counsel to the district court that summarize communications between himself and the government at a high level of generality. The record before us is otherwise barren

18

as to the substance of any representations made by the government to Robert. In light of the minimal evidence submitted, the facts adduced are insufficient to establish prosecutorial overreach.

Because Sean has not satisfied the first prong of the requisite showing, we need not consider the second.

## III.  Admissibility of Robert's FBI Interview

For present purposes, we assume *arguendo* that the silver platter statement was admissible. The questions then become (1) whether the exclusion of Robert's post-arrest statements to the FBI was erroneous and, if so, (2) is it sufficient, standing on its own, to require that Sean's conviction be vacated. For the reasons set forth in this section, we answer those questions in the affirmative. This narrow ground mandates that Sean be given a new trial, regardless of whether or not the silver platter statement was itself hearsay.[3]

---

[3] The dissent focuses primarily on the "powerful" and "overwhelming" evidence mustered by the government, as compared to the "feeble" defense offered by Sean. Dissent at 1. But Sean does not challenge the sufficiency of the evidence against him, and the crux of the dispute is not whether there was an adequate basis for the jury's verdict. Rather, the key question is whether Sean's defense was prejudiced by preclusion of impeachment evidence. We find that it was. That does not mean, of

We review the exclusion of Robert's post-arrest interview "deferentially" for "abuse of discretion," as we do with all evidentiary rulings. *United States v. Dupree*, 706 F.3d 131, 135 (2d Cir. 2013). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

## A. Inconsistent Statements

Following the district court's ruling that the silver platter statement was admissible, Sean moved for leave to introduce excerpts from Robert's post-arrest FBI interview in which Robert was asked about the silver platter statement. The district court did not grant such leave, reasoning that "Robert never specifically denie[d] that [Sean] made the 'silver platter' statement itself," Special App. 3-4,

---

course, that we are somehow second-guessing the jury's assessment of the evidence presented, or that we necessarily believe in Sean's innocence. Those questions are not for this panel to answer. Rather, we find only that Sean was deprived of the opportunity due him to defend himself against the evidence introduced at trial.

20

such that the FBI interview and the silver platter statement were not "inconsistent"

for purposes of Federal Rule of Evidence 806.[4]

---

[4] In the interest of clarity, we reiterate that Robert stated as follows to the FBI:

> FBI: [H]ow do you explain a comment you made to Rick [Cunniffe], that Sean got angry with you when he gave you this information on a silver platter and you didn't invest.
>
> Robert: I think I was just saying to Rick because Sean said, "Uh y'know, all these deals—if you were trading—you could have made like millions of dollars"[,] and I said, "Sean nobody's going to trade and make millions of dollars on this stuff." That wasn't his intention. . . . I think he was just proud of the fact that he was doing deals and y'know, almost like ["]hey, this deal is going to go way up[,"] not intending that somebody was going to trade on it. . . .
>
> FBI: So why did he get mad at you? Why did he get mad at you and say, "I served this up to you on a silver platter and you didn't invest in it." Why did he get mad at you about that?
>
> Robert: Um, I think that—that day, he was clearly drinking. . . . I remember—y'know—during that period, because he was getting divorced, he's—y'know—and um, he just said[,] I think he might've said, "Y'know, Uh, y'know, I said I was working on this deal—gee, if you had invested, you would've made millions of dollars." And I said, "Sean, y'know, people[,] y'know[,] . . . Get arrested for making millions and millions of dollars on confidential information." . . . And that was the end of the conversation.

S.D.N.Y. Dkt. No. 120-2 at 1-2, 11. Furthermore, we also reiterate that the silver platter statement refers specifically to the following recollection by Robert: "I mean I still, I still remember being [indiscernible] years ago. Sean would always say, ah I can't believe

21

"A hearsay declarant may . . . be impeached by showing that the declarant made inconsistent statements," based upon the theory that such a declarant "'is in effect a witness'" and therefore "'[h]is credibility should in fairness be subject to impeachment . . . as though he had in fact testified.'" *United States v. Trzaska*, 111 F.3d 1019, 1024 (2d Cir. 1997) (quoting Fed. R. Evid. 806 advisory committee's note). "[S]tatements need not be diametrically opposed to be inconsistent." *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988) (quoting *United States v. Jones*, 808 F.2d 561, 568 (7th Cir. 1986)). As our sister Circuit has recognized in a related context, "explanations and denials run the gamut of human ingenuity, ranging from a flat denial, to an admitted excuse, to a slant, to a disputed explanation, or to a convincing explanation"; a statement could fall at any point on this spectrum and still be inconsistent. *United States v. Meza*, 701 F.3d 411, 426 (5th Cir. 2012). Accordingly, we apply "two tests to determine inconsistency," asking whether there is "any variance between" the impeachment material and the hearsay statement "that has a reasonable bearing on credibility" or whether a jury could

---

you [indiscernible]. Said I can't believe it. I handed you this on a silver platter and you didn't invest in this . . . ." Supp. App. 143.

22

"reasonably find that a witness who believed the truth of the facts" asserted in the hearsay statement "would have been unlikely to make a statement" of the impeachment material's "tenor." *Ebbers*, 458 F.3d at 123 (quoting *Trzaska*, 111 F.3d at 1024-25). We need only consider the first of these tests.

Robert need not have explicitly denied the silver platter statement to render his discussions with the FBI admissible. Although Robert has consistently acknowledged that some exchange took place between himself and Sean, the precise contents and the import of those discussions have not been similarly uniform. To render the statements inconsistent for purposes of Rule 806, it was enough that excerpts from his FBI interview varied from his earlier recitation of the silver platter statement in a manner such that they cast a different meaning on his discussions with Sean. We find that there is a material difference between the possibility that Sean might have said "I can't believe . . . you didn't invest," Supp. App. 143, as opposed to Sean having said "if you were trading—you could have made like millions of dollars," S.D.N.Y. Dkt. No. 120-2 at 2. The former suggests that Sean expected that Robert would trade, while the latter does not.

That distinction has a reasonable bearing on the credibility of the silver

23

platter statement. *See Ebbers*, 458 F.3d at 123. Regardless of which version of the conversation between Sean and Robert was correct, if either, "the fact of the inconsistency gives the jury an insight into the witness's state of mind; the inconsistency shows that the witness is either uncertain or untruthful. In either event, the inconsistency calls into question the witness's believability." Robert P. Mosteller, *et al.*, 1 MCCORMICK ON EVIDENCE § 34 (7th ed.).

## B. Harmless Error Review

The government argues that even if the impeachment materials are admissible, their exclusion was harmless error. "In order to uphold a verdict in the face of an evidentiary error, it must be 'highly probable' that the error did not affect the verdict." *United States v. Dukagjini*, 326 F.3d 45, 61 (2d Cir. 2003) (quoting *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir. 1995)). Put another way, an "erroneous admission of evidence is harmless 'if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury.'" *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (quoting *United States v. Garcia*, 291 F.3d 127, 142 (2d Cir. 2002)). When assessing the importance of improperly excluded evidence, we consider the following factors:

(1) the importance of the unrebutted assertions to the government's case; (2) whether the excluded material was cumulative; (3) the presence or absence of evidence corroborating or contradicting the government's case on the factual questions at issue; (4) the extent to which the defendant was otherwise permitted to advance the defense; and (5) the overall strength of the prosecution's case.

*United States v. Oluwanisola*, 605 F.3d 124, 134 (2d Cir. 2010). Based upon these considerations, excluding Robert's post-arrest FBI interview was not harmless.

The government contends that the impeachment material would have been cumulative of evidence that was already before the jury in the form of Robert's April 16, 2015, conversation with Cunniffe, in which Robert claimed that Sean was unaware of his investment activities.[5] But that argument does not address the full

---

[5] In relevant part, Robert and Cunniffe had the following dialogue on April 16, 2015:

Cunniffe:    In terms of Sean, do you ever throw him money? Or no?

Robert:    No.

Cunniffe:    No you don't. That is what I thought. I thought it was just out of the goodness and kindness of his heart.

Robert:    No, it's just, you know, it's just stuff he mentions as he goes around, you know, 'Oh, I am working on this, I am working on that.'

Cunniffe:    That is what I figured.

25

breadth of Robert's post-arrest statements. Indeed, it ignores their most salient feature: Robert's FBI interview offered fundamentally distinct recollections of the silver platter exchange that cast a different light on Sean's intentions. Such evidence is not cumulative, "particularly where the case revolved around what [Sean] told [Robert] and what [Robert] told him," because "stray bits" of evidence touching upon similar subject matter, such as Robert's statements exculpating Sean, "do not substitute for [Robert's] direct account" of his discussion with Sean. *United States v. Scully*, 877 F.3d 464, 475 (2d Cir. 2017).

The only other argument offered by the government is its conclusory assertion that "[t]here is no reasonable possibility that . . . [the jury] would have reached a different result" if it had heard Robert's post-arrest statements to the FBI. Gov't Br. 38. We cannot say the same. "We have repeatedly held that the

---

Robert:      I never told him like, I've done anything.

Cunniffe:    Okay. Okay. . . . So you never told him you even invested. . . .

Robert:      No. No.

Jt. App. 680-81 (ellipses in original).

26

strength of the government's case is the most critical factor in assessing whether error was harmless." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009). Given the difficulty of objectively evaluating this factor, appellate courts often look to the length of jury deliberations and the necessity of a modified *Allen* charge as useful proxies. *See, e.g.*, *Parker v. Gladden*, 385 U.S. 363, 364 (1966) ("[T]he jurors deliberated for 26 hours, indicating a difference among them as to the guilt of the petitioner."); *Zappulla v. New York*, 391 F.3d 462, 471 (2d Cir. 2004) ("The length and deliberative conduct by the jury . . . suggests that a conviction was not assured, at least without the [erroneously admitted] confession."); *United States v. Grinage*, 390 F.3d 746, 752 (2d Cir. 2004) ("After brief deliberations, the jurors sent a note that they were hung and, only after a modified *Allen* charge did they reach a verdict. . . . This was a close case." (internal citation omitted)).

Here, the trial lasted only eight days, yet the jury deliberated for five. Moreover, the jurors reported that they were at an impasse and believed themselves to be deadlocked on the third day of deliberation, prompting the district court to provide a modified *Allen* charge in the hopes of spurring them to reach consensus. This cuts strongly against the government's unsupported

assertion that admission of Robert's post-arrest interview would have made no difference to the jury.

We must also consider "the importance of the unrebutted assertions to the government's case." *Oluwanisola*, 605 F.3d at 134. "As a general matter, the prosecution knows intimately the strengths and weaknesses of its case." *Zappulla*, 391 F.3d at 471. The silver platter statement was quite literally the first thing mentioned in the government's opening statement to the jury, and it was the very last thing discussed in the government's rebuttal summation. In its closing arguments, the government referred to the silver platter statement as "devastating" no fewer than three times, Tr. 1558, 1559, 1561, describing it as a "candid admission [that] put the lie to Sean Stewart's testimony," *id.* at 1443, for which "Sean Stewart couldn't come up with an explanation," *id.* at 1561. Such "heavy reliance . . . expose[s] its central role in persuading the jury to convict," as the government "clearly understood that [the silver platter] statement was a powerful weapon" in its arsenal. *Wood v. Ercole*, 644 F.3d 83, 96-97 (2d Cir. 2011).[6]

---

[6] The dissent argues that the strength of the evidence is such that Sean may well have been convicted even absent the silver platter statement. However, that possibility does

28

To be clear, we do not mean to suggest that the government's emphasis on the silver platter statement was improper. The district court ruled that the silver platter statement was admissible. Under those circumstances, it is understandable that the government would introduce and rely on it. But the government's apparent recognition regarding "the impact [the] statement would have on the jury" nevertheless confirms our belief that it was, in fact, important to the prosecution's case. *Id.* at 98; *see also Zappulla*, 391 F.3d at 472 ("The fact that the prosecutor relied on the confession, thereby running the risk of reversal on appeal, tends to show that the prosecutor understood . . . that the confession was

---

not "render[] harmless" the exclusion of Robert's post-arrest statements once the silver platter statement was introduced, Dissent at 20, because neither we nor the dissent can know what result would have obtained had the government not introduced it in the first place. Indeed, the heavy emphasis the government placed on the silver platter statement, as well as the government's concession at oral argument that the statement's introduction would not have been harmless (assuming *arguendo* that it had been erroneous), both suggest that it did not only "add[]incrementally" to the prosecution's case. *Id.* Much of the evidence marshaled by the dissent is undisputed, *see id.* at 11-19, but the silver platter statement is by far the most compelling evidence contradicting Sean's own testimony that he did not intend for Robert to benefit from the information Sean was relaying to him. As intent to benefit the tippee is an element of securities fraud, we cannot know whether Sean would have been convicted if the silver platter statement had not been introduced—or, alternatively, if it had been introduced but impeached.

29

a crucial piece of evidence."). In light of the silver platter statement's importance, that it went unrebutted is a critical strike against the notion that exclusion of Robert's post-arrest statements to the FBI might have been harmless error.

To find Sean guilty, the jury had to conclude that Sean intended that his father would trade, thus personally benefitting from the misappropriation of his employer's material nonpublic information. *See Dirks v. SEC*, 463 U.S. 646, 663 n.23 (1983) ("*Scienter*—'a mental state embracing intent to deceive, manipulate, or defraud'—is an independent element of a Rule 10b-5 violation." (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *United States v. Martoma*, 894 F.3d 64, 76 (2d Cir. 2018) ("[T]he personal benefit element can be met by evidence that the tipper's disclosure of inside information was intended to benefit the tippee."). That conclusion was powerfully supported by evidence that Sean had said to Robert, "I can't believe it. I handed you this on a silver platter and you didn't invest in this." Supp. App. 143. While other evidence of Sean's guilt was proffered, the silver platter statement was the most suggestive evidence of Sean's intent that Robert should trade on the tips Sean supplied.

The jury's decision on the crucial question of Sean's intent might well have been influenced by a doubt as to whether Sean had truly said that he served up information on a silver platter or that he could not believe Robert had not traded on it. Robert's post-arrest statements did not repeat those critical details, the absence of which might have supported inferences that Sean did not know, expect, or intend that his father would invest based upon their discussions. If the silver platter statement is "damning proof" that Sean "acted with deliberate intent that his father trade on material nonpublic information," as argued by the government, S.D.N.Y Dkt. No. 101 at 20, then it hardly seems unlikely that Robert's alternative versions of the same conversation between himself and Sean might have influenced the jury's deliberations. Although Robert never expressly denied the silver platter statement, his post-arrest recollections offer a potentially different interpretation that could, at minimum, have tempered the statement's "devastating" effect.

On this record, we cannot conclude with fair assurance that the admission of Robert's post-arrest FBI interview might not have substantially influenced the jury. *See Al-Moayad*, 545 F.3d at 164. The dissent is surely correct that evidence

31

supporting several elements of the counts against Sean was "overwhelming," Dissent at 1; indeed, much of it was undisputed. Nevertheless, Sean's intent was the central point of contention between the parties. On that issue, the government's evidence was at its weakest. The dissent's compelling recitation of evidence relating to other elements of the crimes alleged does not make the evidence of *intent* any stronger. Because the impeachment material might have undermined the silver platter statement in the eyes of the jury, it risked leaving the government "with a substantially weaker case" as to Sean's intent such that "a guilty verdict would be far from assured." *Wood*, 644 F.3d at 96.

With great respect for the district court, because this evidentiary error was not harmless, we are compelled to vacate Sean's conviction. We therefore need not reach the question whether the silver platter statement was admissible under a hearsay exception—either the penal interest or the co-conspirator exception. Nonetheless, because the district court will need to rule of the admissibility of the silver platter statement upon retrial, we think it desirable to give the court guidance on this question. The district court did not rule on whether the silver platter statement was admissible under the co-conspirator exception to the

32

hearsay rule as codified at Federal Rule of Evidence 801(d)(2)(E). If the district

court had decided that it was admissible under the co-conspirator exception, we

would have affirmed that ruling. There is ample evidence in the record to show by

a preponderance that a conspiracy existed between Robert and Sean with the

objective that Robert trade on the information Sean provided, and that Robert's

silver platter statement to Cunniffe furthered the objective of the Robert-Sean

conspiracy.[7] This may prove a stronger basis for admission of the silver platter

---

[7] We note that the co-conspirator exception looks not to whether the declarant (Robert) made the statement to one who conspired with him (Cunniffe)—which the district court appeared to treat as the test—but rather whether the declarant (Robert) conspired with the defendant against whom the statement is offered (Sean), and that the statement was made during the course of their conspiracy and in furtherance of its objective. *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (citation omitted). The co-conspirator exception stems from the theory that persons in a conspiracy with one another act as each other's partners or representatives in carrying out the objectives of the conspiracy. 2 MCCORMICK ON EVIDENCE, *supra*, § 259; *see also* Edmund M. Morgan, *The Rationale of Vicarious Admissions*, 42 Harv. L. Rev. 461, 464 (1929). The McCormick treatise explains:

> Conspiracies to commit a crime . . . are analogous to partnerships. . . . If A and B are engaged in a conspiracy, the acts and declarations of B occurring while the conspiracy is actually in progress and in furtherance of the design . . . . may . . . be introduced against A as representative admissions to prove the truth of the matter asserted. . . . Federal Rule 801(d)(2)(E) is consistent with the foregoing analysis, treating as [a

statement than the penal interest exception. Of course, we express no view on Sean Stewart's ultimate guilt or innocence, which must be decided by a jury of his peers if he is retried.

## CONCLUSION

For the foregoing reasons, we **VACATE** Sean Stewart's conviction and **REMAND** this matter to the district court for further proceedings.

---

party's] admission a statement 'made by the party's co-conspirator during and in furtherance of the conspiracy.

2 MCCORMICK ON EVIDENCE, *supra*, § 259 (footnotes omitted).

BERMAN, District Judge, dissenting:

I.    **Overview**

Defendant Sean Stewart was fairly tried and convicted of all nine insider trading related counts in the Indictment. The Government's case against Sean consisted of powerful direct and circumstantial evidence and was "overwhelming." *See United States v. Dowdell*, 737 F. App'x 577, 583 (2d Cir. 2018) ("[T]he government's evidence would have been overwhelming even if [the excluded evidence had been admitted.]"), *cert. petition docketed sub nom. Derrick Wilson v. United States*, No. 18-6417 (U.S. Oct. 24, 2018). It included Sean's own incriminating admissions, the testimony of 20 witnesses one of whom was a cooperator, recorded conversations, and written trading records and emails reflecting illegal securities trades.

Sean's defense, by contrast, was feeble. Sean took the stand and admitted that he knowingly and regularly disclosed details of confidential deals that he was working on at JPMorgan Chase (JPMorgan) and Perella Weinberg Partners (Perella) to his father Robert Stewart (a certified public accountant and former

1

chief financial officer).[1] Robert Stewart, together with his associates, made over $1.1 million trading on Sean's inside information. Sean admitted that he knew that Robert purchased and sold shares of Kendle International Inc. (Kendle) after Robert had learned from Sean that Sean was working on a deal at JPMorgan involving the acquisition of Kendle. Sean also confirmed that he intentionally (and regularly) violated "bedrock" finance industry confidentiality norms and obligations and lied to JPMorgan and to Perella – and to industry regulators, including the Financial Industry Regulatory Authority (FINRA) – by consistently discussing his deal work with Robert (and other family members). Perhaps most tellingly, Sean testified that he lied about disclosing inside information because he "*knew it would be potentially damaging for my prospects at the time. I had worked extremely hard to get to the position I was in at that point, and I thought anything might potentially derail my future.*"[2] Tr. 1236. "Intent elements are everywhere in our law and are generally proved with circumstantial evidence. Insider trading is no

---

[1]   The majority acknowledges that "although Sean knew that company policy forbade him from discussing confidential information with anyone other than his colleagues, he did not abide by that rule." Op. at 4 (citation omitted).

[2]   Sean also testified that his father, Robert Stewart, lied to a Securities and Exchange Commission (SEC) investigator about Sean's disclosures of inside information to him. *Id.* at 1350. Sean explained that his father protected him the same way he protected his father. *Id.*

different. A factfinder may infer the tipper intended to benefit the tippee from the sort of objective evidence that is commonly offered in insider trading cases." *United States v. Martoma*, 894 F.3d 64, 76 (2d Cir. 2017) (rehearing *en banc* denied) (citations omitted).

Sean's unpersuasive and inconsistent excuses for improperly disclosing confidential business matters to Robert and other family members were that he "grew up in a household where there were no secrets, and we shared everything about our lives"; and that his father lied when he said to Sean that he would never trade based on anything they had ever discussed (following the unlawful insider Kendle trades). Tr. 1189, 1251. It is no surprise that Sean's jury – whose task it was to assess witness credibility and to decide what the facts were – used common sense and rejected Sean's "tight knit family" story. *See United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury.").[3]

---

[3]  The key question facing the jury, according to the majority, "was whether to believe Sean when he denied that he knew that his father would trade on the information that Sean had provided." Op. at 3**.** The majority acknowledges that "[e]vidently, they did not, as Sean was convicted on all counts brought against him." *Id.*

In sum, this case is about a sophisticated, Yale educated mergers and acquisitions investment banker, Sean Stewart, who knew to a certainty that he was obligated not to "tip off" family and friends about companies and corporate deals that he was working on. Yet, he did exactly that. And, almost immediately after Robert Stewart received inside deal information from his son Sean, Robert and his associates traded in securities of companies involved in those deals.

When the Stewarts were caught, Robert pled guilty to one count of conspiracy to commit securities fraud based upon inside information. One of Robert's associates, Richard Cunniffe ("Cunniffe"), who also traded upon Sean's inside information, pled guilty to insider trading and wire fraud.

Sean pled not guilty and was the principal defense witness at his trial. (Robert refused to testify at Sean's trial.) Sean's testimony clearly was not persuasive to the jury, as he was convicted of all nine counts charged in the Indictment, *i.e.*, one count of conspiracy to commit securities fraud and tender offer fraud; one count of conspiracy to commit wire fraud; six counts of securities fraud; and one count of securities fraud in connection with a tender offer.

## II. The Majority Opinion

In analyzing Robert Stewart's May 14, 2015 post arrest statements and the doctrine of "harmless error," the majority fails to acknowledge the overwhelming evidence of the Defendant's guilt, although it is clearly laid out in the trial transcript. *See* pp. 9-14 *infra*. The majority also ignores longstanding Second Circuit precedent, including *Perkins v. Herbert*, 596 F.3d 161, 179 (2d Cir. 2010) and *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006), which hold that "the strength of the prosecution's case [is] the most important factor in our inquiry." This factor compels a finding that any error in this case was harmless.

And, in remanding for a new trial, the majority fails to defer to the jury in Sean Stewart's case. "Because we accord a high degree of deference to the jury's evaluation of witnesses credibility, jury verdicts should be disturbed with great infrequency." *See Maureen Christensen v. Cty. of Dutchess, N.Y.*, 548 F. App'x 651, 653 (2d Cir. 2013).

## III. Sean's Conviction

The jurors in Sean's case appear to have been thorough and professional throughout their deliberations, as the ten (10) notes sent by the jury to the district judge confirm. Because this was a financial crimes case, the jury was required to

sort through well over 1,000 trial exhibits, including securities trading records, emails, phone call recordings, and the JPMorgan and Perella employee codes of conduct. The jury also had to assess the credibility of the 20 witnesses at trial, including the Defendant and cooperating witness Richard Cunniffe. The jury started its deliberations on Tuesday, August 9, 2016 at 12:20 p.m., and reached its verdict on Wednesday, August 17, 2016 at 9:59 a.m., a total of 4.5 days. Jurors deliberated from 9:30 a.m. to no later than 4:30 p.m.; did not sit on weekends; and did not sit at all on Monday, August 15, 2016.

## IV.    Silver Platter Statement

District Judge Laura T. Swain was at all times thorough and fair to the parties in this criminal litigation.[4] Judge Swain correctly admitted into evidence

---

[4]    Two of Judge Swain's substantive instructions to the jury were as follows:

(1) "In order to establish the third [insider trading] factor that Mr. Stewart anticipated that his father would trade on the information, the government must prove beyond a reasonable doubt that, at the time the information was disclosed, Mr. Stewart anticipated that his father would use the information to trade in securities or cause others to use the information to trade in securities. The government cannot prevail by establishing only that Mr. Stewart shared information that he was required to keep confidential. The government must, instead, prove beyond a reasonable doubt that at the time the information was disclosed, Mr. Stewart anticipated that his father would use that information to trade in securities." Tr. 1605-06.

6

the silver platter statement, after having determined that it was "probative of Robert's alleged collusion with Sean." S.D.N.Y. Dkt. 153. She also stated that the Government had made a "strong" argument for admission under Federal Rule of Evidence 801(d)(2)(E) because the silver platter statement involved "a discussion between admitted co-conspirators." S.D.N.Y. Dkt. 153. Admission of the silver platter statement, as the majority acknowledges, is consistent with *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011), because the statement was made during the course of and in furtherance of a conspiracy.

**Post Arrest Statements**

Following briefing and oral argument, Judge Swain denied Sean Stewart's motion to admit the post arrest statements made by Robert Stewart. She did so

---

(2) "Because an essential element of the crime charged is intent to defraud, good faith on the part of Mr. Stewart is a complete defense to the charge of insider trading. That is, the law is not violated if the defendant held an honest belief that his actions were not in furtherance of any unlawful scheme. Thus, it is a complete defense to the charge of insider trading if Mr. Stewart believed, in good faith, that any information that he provided to his father would not be used for trading purposes. A person who acts on a belief or opinion honestly held that turns out to be wrong, is not punishable under these statutes." Tr. 1608.

*The jury obviously concluded by its verdict that Sean anticipated and intended that his father would use the inside information provided by Sean to trade in securities, and that Sean had acted in bad faith.*

7

because she found "no inconsistency" between Robert's post arrest statements and the silver platter statement.[5] S.D.N.Y. Dkt. 136.

In concluding that the post arrest statements were not inconsistent with the silver platter statement, Judge Swain may have been persuaded by the facts that the post arrest statements appear to be a desperate attempt to minimize Sean's illegal behavior and that they do not include a disavowal or revocation of the silver platter statement. Rather, the post arrest statements seek to explain away Sean's unlawful behavior by reference to his "divorce," his "bragging," his "drinking problem," and his unawareness of "what he's saying." *See* S.D.N.Y. Dkt. 120, Ex. B.

Robert's post arrest statements include the following quotations: "I remember – y'know – during that period, because he was getting divorced, he's– y'know--and um, he just said…*I think he might've said, 'Y'know, Uh, y'know, I said I was working on this deal – gee, if you had invested, you would've made millions of dollars[']*"; "I think [Sean] was just – you know – kind of bragging. Sean's

---

[5]   The majority describes two tests for inconsistency: (1) "any variance between the statement and testimony that has a reasonable bearing on credibility;" and (2) "could the jury reasonably find that a witness who believed the truth of the facts testified to would have been unlikely to make a statement of this tenor." *United States v. Trzaska*, 111 F.3d 1019, 1025 (2d Cir. 1997) (citations omitted)).

bragging about, 'Hey, I'm working on this deal, that deal'"; "I think that – that day [Sean] was clearly drinking. . . . [H]e's got a drinking problem"; and "Y'know – I think – sometimes he [Sean] doesn't realize what he's saying." *Id*. (emphasis added). Although the majority believes that the post arrest statements may have left the Government "with a substantially weaker case," Op. at 32, it seems at least equally likely that Robert's comments may further have convinced the jury of Sean's guilt.

In analyzing harmless error, the majority errs when it concludes that jury deliberations were exceptionally long and that the jury was deadlocked. Four and one half days of deliberations over nine counts in a securities fraud case is *not*, in my experience, excessive. Trial judges routinely advise jurors – as Judge Swain did at Sean's trial – that they may take as much time as they need for full review, discussion and consideration of the evidence. And, a careful review of the trial transcript and the jury notes presented to the district judge on Thursday, August 11, 2016 and Friday, August 12, 2016, shows that the majority incorrectly concludes that the jury was "deadlocked." Op. at 27. The records show *only* that the jury may have been temporarily stuck or at impasse as to one particular count – out of the nine counts in the Indictment. S.D.N.Y. Dkt 181, Court Ex. 15

(Jury Note, dated August 11, 2016: "If it is a split vote on a count and the jury is stuck . . . ?"); *id.*, Court Ex. 22 (Jury Note, dated August 12, 2016: "If the jury is at an impasse on a particular count . . . ?"); Tr. 1705 (District court: "You've indicated in your note that you're at an impasse with respect to a particular count."). The jury was able to reach unanimous agreement as to that particular count – and to reach a verdict of guilty on all nine counts – following a routine instruction from Judge Swain to return to the jury room and review and continue to discuss the evidence and their views with each other.

V.    **The Overwhelming Strength of the Prosecution's Case Against Sean**

The majority contends that Judge Swain's post arrest statement ruling was error and an abuse of her discretion. It requires that the jury's guilty verdict be vacated, and directs that there be a new trial. In my view, even assuming, *arguendo*, that the post arrest statements were legally inconsistent with the silver platter statement, Judge Swain's failure to admit the post arrest statements was harmless error because the strength of the Government's case (i.e., the evidence of Sean's guilt) was overwhelming. *See Reifler*, 446 F.3d at 87 ("In assessing [an] error's likely impact . . . the strength of the prosecution's case is probably the single most critical factor'") (quoting *Latine v. Mann,* 25 F.3d 1162, 1167–68 (2d

10

Cir. 1994)); *United States v. Rolle*, 631 F. App'x 17, 21 (2d Cir. 2015) ("[A]ny error was harmless in light of the overall strength of the government's case."); *United States v. Gupta*, 747 F.3d 111, 136-37 (2d Cir. 2014); *United States v. Miller*, 626 F.3d 682, 690 (2d Cir. 2010) ("Here, there can be no serious claim that the district court's evidentiary ruling had any likelihood of affecting the outcome of the case. The government's evidence of guilt was overwhelming.").

The direct and circumstantial evidence of Sean's guilt was overwhelming and included substantial evidence that Sean intended that Robert trade upon Sean's tips.

**A. Evidence of Sean's Intent**

1. Sean admitted at trial that in violation of his ethical obligations he had *often* disclosed inside information to his father, Robert Stewart, about deals and companies he was working on at JPMorgan (2003 to 2011). The inside information included details about mergers and acquisitions involving Kendle International Inc. ("Kendle") and Kinetic Concepts, Inc. ("KCI"). Sean also knew that Robert "may have picked up the name Kendle and traded in [the] stock" from their unlawful discussion. Tr. 1235.

2. Sean also admitted that he continued to disclose inside information to his father after leaving JPMorgan to join Perella and after he knew Robert had traded in Kendle stock. At Perella, the inside information disclosed related to mergers and acquisitions involving Lincare Holdings, Inc. ("Lincare"), CareFusion Corp. ("Carefusion"), and Gen-Probe Inc. ("Gen-Probe").

3. Sean's explanation for disclosing confidential information to his family included: "[Sean:] Yeah, with [my wife] and with my parents we had a very, very close relationship, and I spoke very freely with them. I grew up in a household where there were no secrets, and we shared everything about our lives."). *Id.* at 1185. Sean: "I've come to know now that [Robert] traded in these stocks and, unfortunately, the only way he could have gotten that information is from our discussions." *Id.* at 1252. Sean's wife was a mergers and acquisitions attorney at a prominent New York City law firm.

4. Sean also admitted at trial that he had violated the JPMorgan and Perella codes of conduct by disclosing confidential client information. Surprisingly, this does not seem to be of great concern to the majority who observe: "Although Sean knew that company policy forbade him from discussing confidential information with anyone other than his colleagues, he did not abide by that rule." *See* Op. at 4 (citation omitted).

5. Sean testified that immediately after JPMorgan's compliance officers reached out to him in August 2011 to schedule an interview regarding the FINRA list of persons who suspiciously traded in Kendle stock, Sean met with his father at the Yale Club and told Robert that Robert's name was on the list.

6. But Sean lied to JPMorgan when he said his father's name was not on the FINRA list. Sean's email to JPMorgan, dated August 2, 2011, falsely stated "don't know anyone [on the list]." Supp. App. 77. At his August 26, 2011 interview with JPMorgan's compliance officers about the FINRA list, Sean lied again when he denied that his father could have gotten information from him regarding Kendle. *Id*; *see* p. 11 *infra*. After the interview, Sean "called [his] dad and let him know that the investigation had been concluded. I told him to never do that again, and he promised that he would not." Tr. 1237.

7. Sean admitted that apart from discussing the names of companies involved in mergers and acquisitions he was working on, he also

provided his father with details about the timing of public announcements related to those deals. *Id*. at 1188 (Defense counsel: "And did you ever tell your father anything about the timing of the Kendle deal?" Sean: "Only that the expected or targeted announcement [of Kendle's acquisition] date conflicted with our wedding." *Defense Counsel: "So you did talk to him about the timing." Sean: "Yes."*) (emphasis added).

8. At his guilty plea on August 12, 2015, Robert stated: "I obtained material, nonpublic information about a number of securities from my son, who I understand had access to this information in the course of his job. For certain of these securities, I provided the information to another individual, Rick Cunniffe, so that he could trade in these securities and share trading profits with me." S.D.N.Y. Dkt. 33.

9. At Sean's trial, the Government introduced into evidence the following April 16, 2016 recorded conversation between Robert Stewart and cooperator Richard Cunniffe:

> Cunniffe: Did Sean, uh did Sean do this [provide inside information] out of the goodness and kindness of his heart for you?
> Robert: No, you know what? I think he gets angry at times. Angry at the industry.
> Cunniffe: Oh, yeah?
> Robert: And it was only . . . I think it was only three—three times. He has actually told me some other ones and I just discounted them and just sa[id] that you know what, I don't want to know about it[.]  App. 678-79.[6]

---

[6]     *See also* p. 6 *supra* where Robert, in his post arrest statements, also attributes Sean's disclosures of inside information to Sean's drinking problem; Sean's divorce; Sean's bragging; and Sean's lack of awareness.

## B. Sean's Full Awareness of the Requirement of Confidentiality

10. Sean went to work at JPMorgan after he graduated from Yale in 2003. He started as an analyst in the mergers and acquisitions group. In 2006, he was promoted to "associate." Tr. 133. In 2010, he was promoted to "vice president." *Id.* at 1135. Sean testified that he "knew everything that was going on" when working on a "particular transaction," *id.* at 1334, and that the majority of the deals he worked on involved public companies. *Id.* at 1136.

11. Sean testified that he knew that "confidentiality was the *bedrock* principle of [his] job." *Id.* at 1359 (emphasis added). He understood that "we were not expected to talk about confidential information with anyone not involved in a particular deal team." *Id.* at 1188. Sean testified that he received "extensive" compliance training at JPMorgan, *id.* at 1188, *i.e.*, at least once a year from 2003 to 2011. Sean also testified that he also "underwent new employee compliance training" when he joined Perella in October of 2011. *Id.* at 1358.

12. Sean admitted at trial that he lied when he affirmed to JPMorgan on July 26, 2011 that he was "in compliance with [JPMorgan's] code of conduct," because he had disclosed confidential information about JPMorgan's clients, including Kendle, to his parents and his wife. *Id.* at 1356-58.

13. Sean also admitted at trial that he disclosed confidential information to his father about the Lincare, CareFusion, and Gen-Probe deals which he either learned about or worked on at Perella, *id.* at 1252; and that he lied to Perella when he "affirmed that [he] was in compliance with [its] confidentiality policies." *Id.* at 1360.

14. At Sean's trial, the Government presented as an exhibit JPMorgan's Code of Conduct which states: "Do not disclose confidential information to anyone outside the firm unless you are authorized to do so. Where such disclosure is authorized, the confidentiality or

14

privacy agreement may be required. Check with the legal and compliance department." *Id.* at 1357.

15. The Government also presented as an exhibit at Sean's trial Perella's written policy on confidential information which states: "Existing or potential client or investor information, information about the existence of or the potential for a client, client assignment, investor or investment should be considered confidential information. . . . You may not disclose confidential information to any person outside the firm, *including family members*, except as required in the performance of the firm's business activities." *Id.* at 1359-60 (emphasis added).

## C. Sean's Lies During the FINRA and SEC Investigations

16. Sean learned of a FINRA inquiry into suspicious Kendle stock trading on May 25, 2011, when he was forwarded an email from a colleague. The Government presented phone records at Sean's trial showing that Sean spoke to Robert that same day and many more times in the days and weeks shortly afterward. Supp. App. 16-28; *see also* pp. 1-2 *supra*.

17. The Government presented at trial an August 2, 2011 email from JPMorgan to Sean and other JPMorgan employees which contained a list of names of persons who traded in Kendle stock (provided to JPMorgan by FINRA). JPMorgan requested that its employees review the list to see if there were any familiar names on it so that JPMorgan could notify FINRA. *The list included "Robert Stewart."* Supp. App. 99. Sean testified that he knew that the purpose of a FINRA cross check was to "look out for potential insider trading." Tr. 1151.

Sean's response email to JPMorgan, also dated August 2, 2011, stated "don't know anyone [on the list]." Supp. App. 77. Sean testified that he lied to JPMorgan about the FINRA list because, as noted, he "knew it would be potentially damaging for my prospects at the time. I had worked extremely hard to get to the position I was in at

15

that point, and I thought anything might potentially derail my future." Tr. 1236 (emphasis added).

18. JPMorgan's compliance officer, Ryan Hickey, testified at Sean's trial that after Sean denied knowing anyone on the FINRA list (that included his father's name), and after a FINRA examiner followed up with Hickey by asking to see Sean's response, JPMorgan, in turn, asked Sean about the list a second time. Following the second inquiry, Sean admitted to JPMorgan that his father's name was, indeed, on the FINRA list.

19. JPMorgan's compliance officer also testified that Sean told him that he (Sean) had "no work discussions" with his father. Tr. 902, 1338.

20. Sean testified that, at his August 26, 2011 meeting with JPMorgan's compliance officials about the FINRA list, he also lied about his father's trading: "I lied. I told them that there was no way that my dad could have gotten that information from me regarding the purchase of Kendle." *Id.* at 1236-37.

21. An SEC investigator, Michael Watson, testified at Sean's trial that in May 2013 he interviewed Robert about his 2011 Kendle trading. Robert told Watson that his Kendle trades had been based on his own research, and that "he did not talk to his son about any work-related matters." *Id.* at 217.

22. Sean testified that his father "lied about [his and Sean's] conduct when he spoke to the SEC." *Sean said that Robert "protected [Sean] the same way [Sean] had protected him." Id.* at 1350 (emphasis added); *see also* p. 1 n.1 *supra.*

**D. Robert Stewart and His Associates' Unlawful Trades**

23. Robert Stewart, Richard Cunniffe, and Mark Boccia ("Boccia") traded securities and profited from the inside information provided

by Sean. They engaged in trades in Kendle, KCI, Lincare, Carefusion and Gen-Probe.

24. The Government presented trading records at trial that showed that – even after their Kendle trades – Robert Stewart and his associates continued to make trades in companies during the time periods that Sean was working on deals involving those same companies, namely, KCI, Lincare, CareFusion Corp., and Gen-Probe. *See* ¶¶ 28-37 *infra*. These records corroborated testimony from Robert Stewart's associates that Robert was passing along insider stock tips to them from Sean. *See, e.g.,* Tr. 531, 775; Supp. App. 30, 32; *see also* ¶¶ 28-37 *infra*.

25. At his guilty plea on May 15, 2015, Richard Cunniffe admitted that he had unlawfully traded in stock options of KCI, Gen-Probe, Lincare, and Carefusion, based upon insider information he received from Robert. Cunniffe agreed to cooperate with the Government and to record conversations with Robert. Tr. 625. Cunniffe testified that Robert told him that "it was [Sean] who was giving [Robert] the information on the stocks[.]" Tr. 733 (emphasis added); 623-624 (Cunniffe: "He told me that his son Sean had given him the information.").

Cunniffe also testified that when Robert told him he was getting information from Sean, Cunniffe told Robert that he "didn't want to know anything about it[.] I wanted to keep as much distance from any knowledge of the information. I knew [Robert] was an accountant and a CFO of some firms in the past[.] . . . I wanted to keep as much distance as possible." *Id.* at 662.

26. At Sean's trial, the Government questioned Cunniffe as follows: Government Attorney: "Do you know why [Robert] asked you to make those trades in your account as opposed to his account?" *Id.* at 623. Cunniffe replied: "I had asked him why he didn't do it in his own account, and he had mentioned that *he was too close to the source.*" *Id.* (emphasis added).

17

27. Mark Boccia testified at Sean's trial that Robert had asked him to purchase Kendle stock options on Robert's behalf in 2011. As noted, Kendle was a company which Sean was advising in confidential acquisition negotiations.

## E. Additional Trades Based on Inside Information

28. Cunniffe testified that in or about March 2012, when Sean was representing Hologic, Inc. in negotiations towards an acquisition of Gen-Probe, Robert told Cunniffe that he "should take a look at GPRO, the ticker symbol for Gen-Probe" because it was "going to be a takeover target." Tr. 711-12. Cunniffe purchased Gen-Probe call options and made $181,000 in profits which he split with Robert. Supp. App. 29.

29. Boccia and Cunniffe each testified that in or about the summer of 2013, when JPMorgan was representing KCI (Kinetic Concepts, Inc.) in negotiations concerning KCI's acquisition by Apax Partners, Robert asked them to purchase KCI call options on his behalf. Tr. 368-69 (Government Attorney: "What prompted you to buy KCI on April 5th?" Boccia: "Bob came to me and says, Mark, I've got another stock I just want to get a few units in, can you buy them for me, I think it's going to be another short-term thing. So I bought them."); *id.* at 645 (Cunniffe: "Bob said he was interested in buying some call options, and I asked him at what strike [price] and at what maturity date he wanted to make the purchase.").

30. Cunniffe testified that in or about June 2012 (which was soon after Sean had learned that Linde AG was seeking to acquire Lincare, Supp. App. 54, Robert told Cunniffe that "he had received another tip and that [Cunniffe] should look at LNCR, which is Lincare." Tr. 725. Cunniffe invested in Lincare stock, and thereafter, split profits of approximately $414,000 with Robert.

31. Cunniffe testified that in the summer of 2014 (when Sean was representing Carefusion in negotiations concerning Carefusion's acquisition by Becton, Dickinson & Co.), Robert told Cunniffe that "he should take a look at CFN [*i.e.*, Carefusion]." *Id.* at 755. Cunniffe then made trades in Carefusion stock options which generated approximately $444,000 in profit. Supp. App. 32. He split the profit with Robert.

32. The Government presented at trial Robert Stewart's trading records which show that he traded in Kendle stock from February 2011 through May 2011. App. 588. At the time, Sean was working on the Kendle acquisition deal at JPMorgan. The Government presented Boccia's trading records which show that he traded in Kendle stock options during the same time period. Supp. App. 37-38.

33. The Kendle stock options which Boccia purchased had strike prices timed throughout May 2011 (the same month in which Kendle's acquisition was announced). Kendle's stock price was then at a high point. *See* Tr. 367-77 (Government Attorney: "Why did you sell all of your Kendle holdings on May 5th?" Boccia: "Because Bob had said to me, hey, Mark, I think I want to get out of the options, I don't think it's going to go any higher.").

34. The Government presented trading records which show that both Boccia and Cunniffe traded in KCI stock options from February through July 2011. Supp. App. 37-41. This was the time period that JPMorgan was representing KCI in its acquisition negotiations.

35. The Government presented trading records which show that Cunniffe traded in Gen-Probe options in April and May 2012. Supp. App. 42. This was the time period that Sean was working on the Gen-Probe acquisition deal at Perella.

36. The Government presented emails which show that Sean received an update about the Lincare acquisition by Linde AG on June 12, 2012.

Supp. App. 42-45. Cunniffe testified that he purchased Lincare stock options at the end of June 2012 after getting a tip from Robert.

37. The Government presented trading records which show that Cunniffe traded in Carefusion stock options from September through October 2014. Supp. App. 32-34. This was a few months after Sean worked on the Carefusion acquisition deal at Perella.

Paragraphs 1-37 above clearly demonstrate the overwhelming strength of the Government's case against Sean. And, these paragraphs do *not* include the silver platter statement. The point is that even without the silver platter statement, the Government would have presented powerful evidence of Sean's intent to commit insider trading and benefit his father. *See* ¶¶ 28-37. The silver platter statement made the Government's case even stronger, *i.e.*, adding incrementally to the overwhelming evidence of Sean's guilt. The evidence renders harmless any error by the district court in excluding the post arrest statements.

Respectfully, I believe the majority errs in vacating Sean's conviction and ordering a new trial.